578 A.2d 228

**EAGLE-PICHER INDUSTRIES, INC., et al.**

v.

**Paul BALBOS, Personal Representative of the Estate of Leslie Balbos, et al.**

No. 1739, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Aug. 29, 1990.

Dennis C. Whelley (Mann & Whelley, on the brief), Towson, for appellant, Eagle–Picher Industries, Inc.

Warren N. Weaver (Louis G. Close, Jr., Lisa A. Kershner and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellants, ACandS, Inc., Owen–Illinois, Inc., Pittsburgh Corning Corp. and Porter Hayden Co.

(H. Emslie Parks, Anthony J. Breschi, John F. Eckhart and Parks, Hansen & Ditch, on the brief), Towson, for appellant, Celotex Corp.

Harry Goldman, Jr. (David M. Layton, Steven G. Warm and Goldman and Skeen, P.A., on the brief), Baltimore, for appellees.

Argued before ALPERT, ROBERT M. BELL and CATHELL, JJ.

ALPERT, Judge.

In this, the last decade of the 20th Century, our judicial system faces an apocalypse in the guise of asbestos cases. As did the "Apocalyptic beast," [1] asbestos rose up "as from the depths of the sea," after having lain dormant for decades, to plague our industries initially and our judicial system consequentially, spreading cancer and asbestosis to thousands of workers along the way.

This 10–week case is just one of more than 8,000 asbestos cases that have been filed in Maryland since 1980.[2] Although estimates vary, it has been reported that there are as many as 50,000 asbestos cases pending nationally.[3] Quite apart from the sheer magnitude in numbers, asbestos litigation presents features that, unfortunately, are common to complex litigation. Most of the cases are of the multi-litigant variety, averaging as many as twenty defendants.[4] When the multitude of cross-claims between those defendants are factored in, the complex metamorphosizes into the maxi-complex. Thus, it seems quite possible that our dockets shall be visited with asbestos litigation well into the next century, each case presenting its unique yet similar tragic scenario.

---

1. V. Ibanez, *The Four Horsemen of the Apocalypse* 173 (C. Jordan trans. 1918).

2. *Cases Jam Civil Court Dockets,* Daily Record, July 11, 1990, at B5, col. 1.

3. T. Willging, *Trends in Asbestos Litigation* 12 (Federal Judicial Center 1987).

4. *Id.*

The immensity of the problem has already required at least one innovative approach here in Maryland. The Court of Appeals recently added new § (d) to Rule 2–327 (Transfer of Action) that permits, *inter alia,* the transfer of " 'any claims or issues' in actions to a circuit court in which the actions might have been brought and in which similar actions are pending." *See* 112th Report of the Standing Committee on Rules of Practice and Procedure, May 23, 1990.

Leslie Balbos and Sutton Knuckles are cast in the leading roles of the tragedy that here unfolds, for they were the victims of mesothelioma, a form of cancer caused by exposure to asbestos. Cast in the roles of the transgressors are:

ACandS, Inc.—Armstrong Contracting and Supply Company—a Delaware corporation which has operated since 1958. ACandS installed asbestos-containing thermal insulation products and is a defendant in the Knuckles case.

Celotex Corporation—a successor to the Philip Carey Company. Celotex manufactured and/or sold asbestos-containing pipe covering, block, and cement from 1906 to 1984 and is a defendant in both the Balbos and Knuckles cases.

Eagle–Picher Industries, Inc.—manufactured asbestos-containing insulating cement from approximately 1930 to 1971, and distributed under its own label Owens–Corning Fiberglass Hylo block and pipe covering from 1960 to 1972. Eagle–Picher is a defendant in both the Balbos and Knuckles case.

Owens–Illinois, Inc.—manufactured and sold Kaylo brand asbestos-containing pipe covering and block insulation from 1948 to 1958 and is a defendant in the Knuckles case.

Pittsburgh Corning Corporation—manufactured and sold "unibestos" pipe covering from 1962 to 1972. A different company manufactured and sold "unibestos" prior to 1962. Pittsburgh Corning is a defendant in the Knuckles case.

Porter Hayden Company—installed asbestos-containing insulation products and operated in four states: Maryland,

New Jersey, Virginia, and North Carolina. Porter Hayden is a defendant in both the Balbos and Knuckles cases.

Decedent Leslie Balbos was employed as a sheet metal mechanic at the Fairfield Shipyard from 1942 to 1944. The Fairfield Shipyard was owned and operated by Bethlehem Steel and engaged solely in the new construction of naval ships. Mr. Balbos was diagnosed in November 1982 as having malignant mesothelioma (cancer of the pleura or lining of the lung) caused by occupational exposure to asbestos during his employment at the shipyard. He died of that disease in September 1983.

On October 2, 1984, Anne Balbos, as surviving widow and personal representative of her husband's estate, and Paul Balbos, as the sole surviving adult child of Leslie Balbos, filed wrongful death and survival actions in the Circuit Court for Baltimore City against eighteen manufacturers, installers, and suppliers of asbestos-containing products including among the named defendants Celotex Corporation, Eagle–Picher Industries, Inc., and Porter Hayden Company. The plaintiffs alleged defendants' negligence, breach of warranty, and strict liability. Anne Balbos died in March 1985, and the complaint was then amended. The amended complaint was brought by Paul Balbos, individually and as substitute personal representative for the estate of Leslie Balbos, and Robert Fox, as personal representative for the estate of Anne Balbos.

Decedent Sutton Knuckles was employed as an "erector" at the Key Highway Shipyard owned and operated by Bethlehem Steel from 1941 to 1982. As an erector, Mr. Knuckles worked primarily with heavy pieces of steel used in the repair of ships. The Key Highway Shipyard was a major ship repair facility that serviced ships from all over the world. Mr. Knuckles was diagnosed in August 1984 as having malignant mesothelioma caused by occupational exposure to asbestos during his employment at the shipyard. He died of that disease in November 1984.

Sutton Knuckles filed a complaint in the Circuit Court for Baltimore City, which was amended upon his death to designate Lucille Killian, Mr. Knuckles's sister, as the personal representative for his estate. The amended complaint named a total of 28 defendants, including ACandS, Inc.; Celotex Corporation; Eagle–Picher Industries, Inc.; Owens–Illinois, Inc.; Pittsburgh Corning Corporation; and Porter Hayden Company. The amended complaint contained eight counts, including claims based on negligence, breach of warranty, and strict liability.

The Balbos case and the Knuckles case were consolidated for trial. In summary, both cases involved claims for damages arising out of asbestos-related cancer deaths from mesothelioma caused by occupational exposure to asbestos and alleged negligence, breach of warranty, and strict liability.

A jury trial involving 14 defendants was conducted in the Circuit Court for Baltimore City before Judge David Ross. The jury returned verdicts in favor of the plaintiffs on the negligence claims [5] and in favor of all the defendants on the product defect claims.[6] In the Knuckles case, the jury assessed punitive damages against Eagle–Picher and Owens–Illinois, Inc.[7] The court denied the defendants' post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial.

All of the defendants mentioned above appealed. Collectively, they raise a total of twenty issues as set out below.

1. The trial court erred in excluding the testimony of Professor Howard Ayer.

---

5. In the Knuckles case, the jury found in favor of two of the defendants, John Crane, Inc. and MCIC, Inc., on the negligence issue.

6. The trial judge had earlier granted the defendants' motions for judgment with respect to the breach of warranty claims.

7. The jury also assessed punitive damages against Raymark Industries, Inc., which is not a party to this appeal.

2. The trial court erred in failing to order a new trial because the jury's verdicts were inconsistent as a matter of law.

3. The trial court erred in failing to direct judgment for Porter Hayden Company in that there was insufficient evidence that decedent Knuckles was exposed to any product for which this appellant was legally responsible.

4. Plaintiffs failed to present legally sufficient evidence to establish that they inhaled sufficient respirable asbestos from Eagle–Picher products to render such products a substantial factor in causing them harm.

5. The trial court erred in refusing to instruct the jury in respect to the definition of "substantial factor" in the context of asbestos-related diseases.

6. Plaintiffs failed to present legally sufficient evidence to establish that the defendants' failure to place warnings on their products amounted to negligence.

7. The trial court erred in refusing to instruct the jury in respect to the defense of contributory negligence.

8. The trial court erred in refusing to instruct the jury that the focus of their analysis of allegedly culpable conduct should be confined to conduct at and before plaintiff's last mesothelioma-producing exposure to asbestos.

9. The trial court erred in failing to give appellant's requested instructions on the sophisticated user defense and superseding cause.

10. Plaintiffs failed to present legally sufficient evidence to establish that Eagle–Picher's conduct was so egregious as to support an award of punitive damages.

11. The trial court erred in denying Eagle–Picher's motion to dismiss Knuckles' claim for punitive damages in count one of his amended complaint seeking damages for negligence on grounds the complaint failed

to state a claim for punitive damages upon which relief could be granted.

12. The trial court erred in denying Eagle–Picher's motion to dismiss Knuckles' claim for punitive damages in that such claim was unconstitutional and in violation of the Maryland Declaration of Rights.

13. The award of punitive damages violates Owens–Illinois' right to due process of law by subjecting the defendant to multiple punishments for the same alleged wrong.

14. The award of punitive damages violates Owens–Illinois' right to due process of law because the standards for calculating the sum of the award gave no guidance regarding the appropriate amount of punishment.

15. The trial court erroneously deprived appellant of its right to participate in the exercise of six peremptory strikes.

16. The trial court erred in ruling that plaintiffs could read certain deposition testimony of Dr. Daniel Braun and in ruling inadmissible other inconsistent deposition testimony of Dr. Braun offered by Eagle–Picher.

17. The trial court erred in ruling that conservation orders published in the Federal Register regulating use of asbestos from 1942 to 1945 could not be presented to the jury.

18. The trial court erred in ruling that documentary evidence from the Asbestos Textile Institute was admissible against Eagle–Picher.

19. The trial court committed an abuse of discretion by admitting into evidence a videotape depicting Leslie Balbos on his deathbed.

20. The trial court erred in denying defendants' motion for judgment in respect to Anne Balbos's wrongful death claim since plaintiff failed to present legally sufficient evidence to establish the amount of dam-

ages to which the Estate of Anne Balbos was entitled on account of Leslie Balbos's death.

We shall reverse the judgments for punitive damages in favor of the estate of Sutton Knuckles. We shall affirm all remaining judgments.

1.

The trial court erred in excluding the testimony of Professor Howard Ayer.

■ The sanctity, indeed the future, of the pre-trial order (in mass tort litigation) is at stake in this case. The question before us is whether the trial court erred by not allowing Professor Howard Ayer to testify because his name was not among the witnesses listed in the final pre-trial order.

*The Proceedings*

The "master" pre-trial order[8] for this case was filed in 1987. The order included, inter alia, a list of witnesses and submissions scheduled prior to trial. The schedule ran as follows:

(a) 120 days before trial, final list of defendants' non-medical experts submitted;[9]

(b) 30 days before trial, parties exchange pre-trial orders;

---

**8.** The master pre-trial order for asbestos cases in Baltimore City regulates the docketing of cases; establishes "master files" (Bethlehem Steel cases, Shipyard cases, for example); regulates the nature and timing of interrogatories, document requests, requests for admissions, depositions (including videotape depositions); regulates the nature and timing of medical examinations; and establishes future trial dates with various pre-trial deadlines.
In re: Baltimore City Personal Injury and Wrongful Death Asbestos Cases, Consolidation File No. 89236704 (Baltimore City Cir.Ct., April 24, 1990), memorandum opinion and order of consolidation, *reprinted in* Daily Record, June 1, 1990, at 12, col. 2.

**9.** Actually the "master" pre-trial order stated the date for submission as X—120, where X was supposed to equal the first day of the month in which the trial was scheduled to begin (October 1, 1988). However, because of some delay X instead was equal to the actual day of the trial, October 24, 1988.

(c) 25 days before trial, notification by parties of any disputes or differences to the pre-trial orders;

(d) 25 days before trial, expert witness depositions completed; and

(e) 20 days before trial, final pre-trial order and voir dire filed.

Professor Ayer was named in the "master" pre-trial order, and in the appellants' final list of experts, which was submitted to appellees' counsel on May 26, 1988. In addition, on July 22 and August 1, 1988 respectively, appellees' counsel was informed at a meeting with counsel for one of the defendants and via a follow-up letter that Ayer would be called to testify. At the same meeting and via the same letter, appellees' counsel was offered information about Ayer but declined to consider the information because he already knew about Professor Ayer.[10] The final pre-trial order and voir dire were typed in the liaison (defense) counsel's office and filed on September 23. Although the list of witnesses within the body of the order did not include Ayer's name as a result of a typographical error, the list of witnesses for voir dire purposes did include his name.

On October 24, 1988 the trial began. At the outset of the trial, Ayer's name was read to the jury in voir dire. On December 14, 1988, appellants' counsel, during his opening statement, told the jury that Ayer would testify and summarized the issues Ayer would address. The trial court recessed for the holidays from December 17, 1988 through January 2, 1989. The absence of Ayer's name in the pre-trial order was first discovered by appellees' counsel a few days before the trial resumed, when he was reviewing his notes on the appellants' opening statement.

On January 4, 1989, appellees' counsel objected to appellants' calling Ayer to testify because his name was not listed in the final pre-trial order filed September 23, 1988.

---

**10.** Although it is unclear how and what appellees' counsel knew about Ayer, it was noted that appellees' co-counsel took Ayer's deposition in another case.

Judge Ross heard arguments from both sides on two occasions and sustained the objection on the ground that he could not

say that it would not be prejudicial to the plaintiffs to permit the witness to be called without the adequate notice, without the notice that is required by the pretrial order. So aside from the precedential value or importance of the decision [with respect to adherence to the pretrial order], on the merits of what we have before us, an error [was] made and who suffers the consequences of that error ... has to fall on the side that made the error.

On January 4, after Judge Ross made his initial decision not to allow Ayer to testify, appellants' counsel requested permission to proffer a transcript of the testimony Ayer would have given if allowed to testify. It is, however, not clear from the record whether the proffer was ever successfully completed.

The decision not to allow Ayer to testify was based solely on the violation of the pre-trial order.

Appellants contend that the trial court's exclusion of Ayer constituted an abuse of discretion because it failed to find manifest injustice in the exclusion of Ayer; refused to permit a continuance to allow appellees to prepare for Ayer; and failed to apply a consistent ruling as to the function of the pre-trial order.

### The Pre–Trial Order—Its Importance

The pre-trial order is an extremely important tool in managing the docket and trials. The pre-trial order codifies the decisions made at the pre-trial conference concerning the facts to be relied on in support of claims; the issues that will be raised; stipulated facts; damages claimed and relief sought; documents and records to be offered into evidence at trial; names and specialties of expert witnesses who will be called, *see* Rule 2–504; and, in the instant case, a time schedule for various pre-trial notifications and submissions.

The pre-trial order is especially important for the effective management of asbestos cases which have flooded the judicial system allowing little time for other civil cases. The scarcest resource in the litigation system is judicial trial time. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U.L.Rev. 659, 663 (1989). As noted above, over 8,000 asbestos cases have been filed in Maryland to date. Additionally, up to 200 cases continue to be filed each month.[11] Such numbers are alarming. The pre-trial order is the guiding light upon which each party is entitled and encouraged to rely. Its importance, especially in complex and mass tort cases, cannot be overstated.

Maryland Rule 2–504(c) states in pertinent part that "[t]he [pretrial] order controls the subsequent course of action but may be modified by the court to prevent manifest injustice." This rule reposes in the trial judge a great deal of discretion. *See Wong v. DiGrazia*, 60 Cal.2d 525, 35 Cal.Rptr. 241, 253, 386 P.2d 817, 829 (1963).

In *Nolan v. Dillon*, 261 Md. 516, 526, 276 A.2d 36 (1971), during the trial, counsel for the defendant "attempted to make an end run and to advance" claims that were beyond the issues formulated in the pre-trial order. The defendant claimed that the trial court had erred by limiting him to issues formulated in the pre-trial order and noted that the federal counterpart to the Maryland rule allowed modification of the pre-trial order to prevent manifest injustice. The Court of Appeals held that, under the circumstances of the case, there had been no abuse of discretion.

In the posture of the case before us, we need not reach the basic issue. Judge Levine gave all counsel an opportunity to modify the pre-trial order, and took the precaution of having them endorse the order which was filed. As we see it, from that moment, the order controlled the

---

11. *See In re: Baltimore City Personal Injury and Wrongful Death Asbestos Cases*, Consolidation File No. 89236704 (Baltimore City Cir. Ct., April 24, 1990) (memorandum opinion and order of consolidation), *reprinted in* Daily Record, June 1, 1990, at 12, col. 3.

course of the trial, subject to the court's discretionary power to permit modification as justice may require. Under the circumstances here, we find no abuse of discretion.

*Id.* at 526–27, 276 A.2d 36.

## Discretion—Its Use and Abuse

Trial judges owe a duty to the public to manage their dockets and trials efficiently to ensure timely access by the aggrieved to our courts. The goal of judicial management is to increase court efficiency and improve the quality of justice. In *Calder v. Levi*, 168 Md. 260, 177 A. 392 (1935), the Court of Appeals recognized that

> It is an essential function of the court to maintain order and assure propriety of the conduct of legal proceedings, by the enforcement of reasonable rules and regulatory orders. In no other way may the administration of justice proceed with dignity, calmness, and impartiality in its appointed course.

*Id.* at 274–75, 177 A. 392. The court went on to note that with the duty to manage judicial resources comes wide discretionary powers to ensure its accomplishment. "A large measure of discretion must necessarily reside in the court, and its exercise will not be reviewed unless it clearly appear[s] that prejudice has resulted from the denial of a legal right." *Id.* at 275, 177 A. 392 (trial judge abused discretionary powers in not allowing victim of car accident to appear as witness against the wrongdoer because of victim's physical and nervous condition).

The use of discretion in excluding the testimony of a material witness is critical in the case *sub judice.* A leading case on the use and abuse of discretion is *Taliaferro v. State*, 295 Md. 376, 456 A.2d 29 (1983). There the defense sought to introduce the testimony of an alibi witness on the last day of trial. Because the defense did not disclose the witness's identity to the State until that day, the trial court excluded the proffered alibi evidence based upon a precursor of current Md. Rule 4–263(d)(3). The

defendant appealed, alleging that the trial court abused its discretion in refusing to permit the witness to testify. The Court of Appeals noted that whether the exclusion of alibi witness testimony was an abuse of discretion turned on the facts of the particular case. The court applied the principal relevant factors used by most courts to determine abuse of discretion:

(1) whether the disclosure violation was technical or substantial;

(2) the timing of the ultimate disclosure;

(3) the reason, if any, for the violation;

(4) the degree of prejudice to the parties respectively offering and opposing the evidence; and

(5) whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.

*Id.* at 390–91, 456 A.2d 29. After weighing all these factors, the court held that because the defendant knew the identity and address of the witness, knew the date of the trial, had been asked by counsel about witnesses, and provided no justifying excuse for not disclosing the witness until the close of the State's case, the trial court had acted well within its discretion. *Id.* at 398, 456 A.2d 29.

The *Taliaferro* factors are somewhat instructive in our analysis of the trial court's rejection of the Ayer testimony. As the *Taliaferro* court noted, "Frequently these factors overlap. They do not lend themselves to a compartmental analysis." *Id.* at 391, 456 A.2d 29.

### (1) *Was the violation technical or substantial?*

In discussing the difference between a mere technical disclosure violation and a substantial disclosure violation, the *Taliaferro* court cited *State v. Silva,* 118 R.I. 408, 374 A.2d 106 (1977). *Taliaferro,* 295 Md. at 391, 456 A.2d 29. In *Silva,* the trial court excluded alibi testimony for lack of compliance with the Rhode Island rule's specificity requirements. The defendant had provided the name but not the

address of the alibi witness and had not stated precisely at which of two given locations he had been at the time of the offense. The appellate court held that the trial court abused its discretion because, even though the address and precise location had not been provided, there was substantial compliance with the letter and spirit of the rule.

Here, although Professor Ayer's name was not listed in the final pre-trial order, it was listed in the master pre-trial order, the appellants' final list of experts submitted to appellees' counsel on May 26, 1988, a letter to appellees' counsel dated August 1, 1988, and the voir dire list. Appellees' counsel, therefore, knew about the witness for discovery purposes and was only unaware of the witness for purposes of "begin[ning] their detailed preparation for the trial." Because the error was inadvertent and a result of a typographical error, and the deficiency in preparation time for the appellees' counsel could be remedied by a continuance to allow for detailed preparation, the appellants' error was, arguably, not a violation of the spirit or intent of the rule and therefore may be categorized as simply technical non-compliance.

### (2) *Timing*

The final pre-trial order was filed 20 days before trial. The fact that Professor Ayer's name was not on the pre-trial order list of witnesses was discovered by the plaintiff's counsel approximately 70 days after the trial began or approximately three months after the filing of the pre-trial order. This time period is substantial.

### (3) *The reason for the violation*

The reason Professor Ayer's name did not appear on the pre-trial order was an inadvertent typographical error by the liaison counsel's office that was not observed and corrected because appellants' counsel failed to proofread the order. Even though the mistake was not intentional, it was within the control of the appellants to have prevented it.

### (4) *The degree of prejudice*

The bulk of appellees' claim of prejudice was centered around not being able to prepare adequately for cross examination of the witness because they did not have copies of the Ayer's depositions. As pointed out by the appellants' counsel and acknowledged by the trial judge, the final pre-trial order does not serve as a notice for discovery and this sort of discovery preparation is begun long before the final pre-trial order is filed.

Appellees' counsel pointed out, however, that the way the pre-trial order was established in this case, provided a five-day "escape hatch" in which a deposition could have been taken, since the pre-trial order was due five days before the depositions were required to be completed. He explained this escape hatch "[i]f we see an expert that we have no information on, we have five days to call up and say '[h]ey I need to depose your witness....'" Since the facts indicate that appellees' counsel had been informed on at least three occasions prior to the pre-trial order that Ayer would be called to testify, and was offered information on the witness but claimed to have information on him already, it is arguable that appellees' counsel did not rely on the pre-trial order in not gathering discovery-type information prior to the filing of the pre-trial order, and would not have benefitted from the "escape hatch."

The trial judge correctly noted, however, that the function of the listing of witnesses in the pre-trial order was to alert the parties to the final, narrow, short list of witnesses to be confronted at trial so that the parties could limit their preparation for examination and cross-examination during the few days remaining before the witness was called. And the trial judge found that the appellees' counsel did rely on the pre-trial order and therefore was "caught short."

Appellants' counsel's argument on the issue of prejudice was focused less on the prejudice appellants would sustain, and more on the claim that appellees would not suffer one iota of prejudice. They claimed prejudice to appellants but

gave only the following reasons why appellants would be prejudiced: the witness "knew the times," was an industrial hygienist and participated in the shipyard studies on behalf of the U.S. Government; no other witness could duplicate his testimony since he was a member of the U.S. Public Health Service from 1948–1972; it would be difficult to get substitute witnesses because they were out of town witnesses; and "He is our head gun." Counsel did not elaborate on these statements or on the importance of the contents of Ayer's testimony. The record does not show that appellants met the considerable burden of proof in this type of case on the degree of prejudice they would suffer if the testimony were not allowed.

(5) *Cure by postponement/desirability of continuance*

The last consideration is "whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." In *Colter v. State,* 297 Md. 423, 429, 466 A.2d 1286 (1983), the court found abuse of discretion partially because "the court gave scant consideration to ... 'whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.'" The court distinguished the case from *Taliaferro,* where thorough consideration was given to a continuance before rejecting that alternative. *Id.* In the instant case, assuming that appellees' counsel did rely on the pre-trial order for not starting the "36 hour rule" preparation for Ayer, a continuance as granted plus appellants' offer to provide appellees with all the information and depositions they had on Ayer probably would have remedied any prejudice to appellees.

Although the trial judge did not consider a continuance for the purposes of permitting Ayer to testify as an alternative solution, he did agree to a continuance to allow appellants a substitute witness (for Ayer) from among those listed on the pre-trial order. In arriving at his decision not to permit the Ayer's testimony, the judge based his ruling on many, if not all, relevant considerations, not the least of

which included the precedental effect of his decision on the efficiency of the courts in future asbestos litigation and the integrity of the pre-trial order. The judge reviewed the requirements of the pre-trial order; the purpose of the pre-trial order; the reason for the violation of the order; and the prejudice to the respective parties. In addition, the learned trial judge raised several relevant concerns. The judge was concerned that, if he allowed Ayer to testify, every time a mistake was claimed by one party the burden of proof would shift to the opposing party to prove he had been hurt by the mistake. He also was concerned that the door would be open for "chicanery" and that the court would then have the burden of determining, in every case where a name is not on the list, whether it was intentional, or a change of mind, or a tactical ploy. And finally, he was concerned that if he overlooked the "slip up" there would be no incentive for anyone to obey the rules.

Appellants further maintain that the trial court's decision not to allow Ayer to testify was inconsistent with an earlier court decision to allow one of appellees' witnesses to testify. That witness was not identified in witness letters prepared by appellees but was listed on the pre-trial order. We find no inconsistency in these rulings. The court acted consistently to protect the integrity of the pre-trial order by ruling in both situations that a witness may testify if the witness's name was listed in the pre-trial order. As mentioned above, and apparently not contested by appellants, the manner in which the pre-trial order was established in this case provided a five-day "escape hatch" in which a deposition could be taken if a name of a witness, of which a party was unaware, appeared in the pre-trial order.

In *Taliaferro*, the Court of Appeals noted that "the exclusion sanction should be one of last resort, to be 'invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice.'" 295 Md. at 395, 456 A.2d 29. The Court went on, however, to emphasize the need to permit the exclusion sanction in order that the notice-of-alibi rule may have practical signifi-

cance. 295 Md. at 395–97, 456 A.2d 29. The same is true for the enforcement of the pre-trial order rule. To give teeth to that rule and to effectuate its goal of efficient docket and trial management, the court must be allowed to employ meaningful or even drastic sanctions as the court has in the case at bar. *Id.* at 397, 456 A.2d 29. Permitting a continuance to prepare for Ayer would not have served as a sanction for violating the pre-trial order. As the *Taliaferro* court noted,

> the threat of a continuance is not a sanction at all.... If all the defendant risks is a continuance, he will purposely not give notice [of a witness] because the witness is valuable to him.... The effect of using continuance as a "sanction" is also *contra* the deep concern of the bench and bar with trial delay.

*Id.* at 396, 456 A.2d 29 (quoting Epstein, *Advance Notice of Alibi*, 55 J.Crim.L., Criminology & Police Sci. 29, 35–36 (1964)). Although the trial judge found that appellants did not purposely omit Ayer's name from the list of witnesses, but rather failed to proofread and correct the pre-trial order, that does not excuse appellants from the imposition of a sanction for not adhering to the requirement that the names of all witnesses appear in the pre-trial order.

Other factors considered by the court to determine abuse of discretion are found in *McCloud v. State,* 317 Md. 360, 564 A.2d 72 (1989). There the Court stated that the defense's request to argue last required an exercise of the court's discretion, and that exercise of discretion involved a ruling based on all considerations and a balancing of alternative solutions.

> When a court is required to exercise discretion, it must identify principles of law that govern the situation before it and then attempt to apply them in light of the factual and procedural posture of the case. This involves an exercise in balancing alternative solutions and deciding which one to apply, in order to advance the interests of justice.... Put otherwise, "discretion is properly exer-

cised if a trial judge makes his ruling based on '*all the considerations* which properly enter into the problem.' "
*Id.* at 367, 564 A.2d 72 (citations omitted).

The facts of the instant case indicate (1) that Ayer's proposed testimony was relevant, (2) that the transgression from the pre-trial order by the defendant was inadvertent, and (3) that the prejudicial effect of the transgression on the appellees may have been relatively minor and might have been remedied by other less harsh means. The importance of adhering to and being able to rely on the pre-trial order in this type of case, however, significantly outweighs the interest in having all relevant testimony. If this were an ordinary case, the factors to be considered in determining abuse of discretion as stated in *Taliaferro* and *McCloud* might warrant reversal. But this was not such a case and the collective interests of society in the disciplined management of these all-consuming asbestos cases must be weighed heavily against any prejudice suffered by a party. The parties have and in this case had an active role in creating the pre-trial order and it was their responsibility to ensure its quality. Therefore, the "manifest injustice" standard required by Rule 2–504(c) for a modification of a pre-trial order in this case and other (asbestos) mass tort cases is a difficult one to meet.

In light of the overwhelming public interest in ensuring fair and efficient adjudication of these asbestos cases, we hold that the trial court properly—and not arbitrarily—exercised its discretion in not allowing testimony by a witness whose name was not included in the pre-trial order. *See Butkus v. McClendon,* 259 Md. 170, 173, 269 A.2d 427 (1970).

2.

The trial court erred in failing to order a new trial because the jury's verdicts were inconsistent as a matter of law.

With respect to both Balbos and Knuckles, the jury found (1) that the decedents' deaths were caused by

appellants' negligence, and (2) that the decedents' deaths were not caused by appellants' unreasonably dangerous products. Appellants Owens–Illinois, Pittsburgh Corning, ACandS, and Porter Hayden argue that they could not consistently have been found to have acted negligently with respect to the use of products which the jury also concluded were not unreasonably dangerous in the absence of any warning. They contend, therefore, the trial court erred in denying appellants' motion for a new trial on the grounds that the jury's verdicts were inconsistent as a matter of law. Assuming arguendo, that the verdicts were inconsistent,[12] we hold that the trial court properly denied appellants' motion.

Inconsistent jury verdicts generally are not sufficient grounds for an appellate court to reverse a jury's verdict. *Steffey v. State*, 82 Md.App. 647, 573 A.2d 70 (1990). As the Court of Appeals stated in *Mack v. State*, 300 Md. 583, 594, 479 A.2d 1344 (1984), "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (quoting Justice Holmes in *Dunn v. United States*, 284 U.S. 390, 394, 52 S.Ct. 189,

---

**12.** Arguably, the verdicts in the case *sub judice* may not in fact be inconsistent. The verdict sheet, in its first interrogatory, asks whether the death of each plaintiff was caused by the negligence of each defendant. The second interrogatory asks *only* whether the death of the plaintiff was caused by an unreasonably dangerous product of each defendant. The jury may have concluded that whereas the product in its finished state was not "unreasonably dangerous," the defendants were negligent in not issuing a warning as to the dangers involved in the application and/or installation of the respective products.

We further note that federal and state courts' holdings have reflected the principle that an appellate court must view a case in a way that reconciles the jury's verdicts if at all possible. *See Wagner v. International Harvester Co.*, 611 F.2d 224 (8th Cir.1979); *Hasson v. Ford Motor Co.*, 19 Cal.3d 530, 138 Cal.Rptr. 705, 564 P.2d 857 (1977); *Peterson v. Little Giant Glencoe Port. Elev.*, 349 N.W.2d 280 (Minn. App., 1984); *Sterner v. U.S. Plywood–Champion Paper, Inc.*, 519 F.2d 1352 (8th Cir., 1975).

76 L.Ed. 356 (1932)). *See also Ford v. State,* 274 Md. 546, 337 A.2d 81 (1975).

In so holding, we realize that this precedent has previously been applied by Maryland courts only in criminal cases.[13] We believe, however, that the rationale for this principle is equally valid when applied in civil actions. Here too, we are reluctant "to interfere with the results of unknown jury interplay" at least without proof of "actual irregularity." *See Ford,* 274 Md. at 553, 337 A.2d 81. We recognize that inconsistency may be the product of lenity, mistake, or a compromise to reach unanimity. The continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it. *See Shell v. State,* 307 Md. 46, 54, 512 A.2d 358 (1986).[14]

3.

The trial court erred in failing to direct judgment for Porter Hayden Company in that there was insufficient evidence that decedent Knuckles was exposed to any product for which this appellant is legally responsible.

On the issue of proximate cause, the plaintiff must introduce evidence "which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Robin Express Transfer, Inc. v. Canton R.R.,* 26 Md.App. 321, 335, 338 A.2d 335 (1975). Porter Hayden contends that appellees failed to present

---

**13.** This court, in *Food Fair Stores, Inc. v. Lascola,* 31 Md.App. 153, 167, 355 A.2d 757 (1976), stated "the fact of inconsistency between one verdict and another returned by the same jury does not automatically make either verdict illegal." *Food Fair Stores,* however, is not controlling. There we reversed the lower court, holding only that the entry of judgments nisi terminated any power the trial judge had to make any further findings of fact or in any other way mold the findings into a judgment.

**14.** We note that our holding here is inconsistent with the holding in *Werner v. Upjohn,* 628 F.2d 848 (4th Cir.1980). The federal court in *Werner,* however, neither offered authority to support its position nor gave any indication that it was interpreting Maryland law.

sufficient evidence that Knuckles was exposed to the company's products. Thus, Porter Hayden argues, appellees failed to prove that the products were the proximate cause of Knuckles's mesothelioma.

The first step in Porter Hayden's argument is, essentially, that appellees failed to produce sufficient evidence that Porter Hayden's products were even used at Key Highway. We disagree. Charles Holterman worked for Porter Hayden, originally called H. W. Porter, from 1947 to 1987 as a contract estimator, a branch manager, and an executive vice president. He testified that H. W. Porter was formed by four former employees of Johns–Manville. He also stated that H. W. Porter generally bought the asbestos products it installed from Johns–Manville and that Porter was "almost" an exclusive distributor for Johns–Manville. Appellees contend that Holterman's comments are proof that Johns–Manville products at Key Highway were placed there by Porter Hayden.

Porter Hayden, however, argues that Holterman's remarks did not mean that Johns–Manville sold almost all of its asbestos through Porter Hayden. Rather, appellant argues, Holterman meant that Porter Hayden sold almost nothing but Johns–Manville products, but that Johns–Manville sold undetermined amounts of its products to companies other than Porter Hayden. Thus, Johns–Manville products found at Key Highway might have been placed there by some other contractor. We agree with Porter Hayden's construction of Holterman's testimony.

Shortly before he made the "exclusive distributor" remark, Holterman said, "Also, Johns–Manville sold material directly to larger concerns and we have learned, as years have gone by, that they sold to other contractors when we thought we were kind of exclusive distributors." In addition, it is clear from the following colloquy surrounding Holterman's "exclusive distributor" comment that Porter Hayden's interpretation was accurate:

[Attorney for plaintiffs]: Let me make it very specific, from 1947 up until 1970, did you, did Porter offer any

asbestos containing insulation products in its material sales business, other than those which were manufactured by Johns–Manville?

A: Yes.

. . . .

. . . .

A. We normally stocked Johns–Manville material, but if a customer specifically asked for the materials of some other manufacturers, we would provide it, and, so to that degree we did not sell Johns–Manville material exclusively.

Q. So, insofar as sales were concerned you would say that you were almost an exclusive distributor for Johns–Manville products?

. . . .

A. I think that's fair to say.

As Porter Hayden acknowledges in its brief, however, an asbestos insulator named Santo John Conigliaro testified that Porter Hayden did contracting work at Key Highway at times between 1964 and 1968. From Conigliaro's testimony that Porter Hayden contractors were at the site, and Holterman's testimony that most of what Porter Hayden used were Johns–Manville products, a reasonable jury could have inferred that any Johns–Manville products identified at Key Highway were Porter Hayden products.

Appellees then had only to identify Johns–Manville products at Key Highway for the identification chain to be complete. Appellees succeeded in offering such evidence. Elmer Sakowski, for example, testified that he worked with Sutton Knuckles on a number of ships in the 1970s. According to Sakowski, he worked around Johns–Manville products and Knuckles was around him most of the time when he saw them. Another witness, George Robert Edwards, worked in the Key Highway facility's warehouse from 1951 to 1982. He testified that Johns–Manville asbestos products were kept in the warehouse.

The second step of Porter Hayden's argument is that, even assuming that Porter Hayden products were used at Key Highway, appellees "failed to introduce *any* evidence that decedent Knuckles ever worked in the vicinity of Porter Hayden insulators," and, thus, Porter Hayden products. In support of this argument, Porter Hayden relies heavily on *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986). In that case, a man who had worked at the Key Highway Shipyard from 1940 to 1979 developed asbestosis and filed suit against a number of producers of asbestos-containing products. In concluding that the plaintiff failed to prove a reasonable probability of causation between the plaintiff's disease and the defendants' products, the Fourth Circuit stated:

> [W]hen one considers the size of a workplace such as Key Highway Shipyard, the mere proof that the plaintiff and a certain asbestos product are at the shipyard at the same time, *without more,* does not prove exposure to that product.

*Id.* at 1162 (emphasis added).

As we noted above, appellees in the case before us did introduce sufficient evidence that Porter Hayden's asbestos-containing products were used at the Key Highway Shipyards when Knuckles worked there. Unlike the plaintiff in *Lohrmann,* however, appellees also presented expert testimony that asbestos fibers break apart when asbestos products are applied to ships or are removed, that the fibers can be carried by air currents for miles, and that studies have shown that individuals living around asbestos factories have contracted mesothelioma.[15]

In *Lockwood v. ACandS, Inc.*, 109 Wash.2d 235, 744 P.2d 605 (1987), the Supreme Court of Washington, in a unanimous en banc decision, placed a great deal of weight on expert testimony concerning this "drifting" of asbestos fibers. The plaintiff in that case had been a rigger in

---

**15.** Porter Hayden does not appear to argue that this expert testimony, given by Dr. William Nicholson, was improperly admitted.

shipyards from 1942 to 1972. He contracted asbestosis and filed suit against a number of producers of asbestos-containing products. One of Lockwood's witnesses testified that insulators working on the conversion of a large ocean liner called the *George Washington* in 1947 and 1948 used the same asbestos materials as those he saw used at the Todd Shipyards in 1946. According to the witness, insulators at the Todd Shipyards had used asbestos cloth manufactured by a predecessor of one of the defendants in the case, Raymark Industries (Raymark). While the plaintiff himself did not identify Raymark as one of the manufacturers of the asbestos products he had used, he did testify that he had worked on the overhaul of the *George Washington* and that there was asbestos on that kind of job.

Following its discussion of the testimony of the witness and the plaintiff himself, the court addressed "[t]he second significant portion of the record," the expert testimony that asbestos dust, after it is released, drifts in the air and can be inhaled by bystanders who do not work directly with asbestos. According to the court, "Thus, even if Lockwood did not work directly with Raymark's product on the *George Washington,* it is reasonable to infer that since that product was used on that ship when Lockwood worked there, Lockwood was exposed to it." 744 P.2d at 612–13. We find *Lockwood* more persuasive than *Lohrmann* because the plaintiff in *Lockwood* presented evidence of asbestos "drift," while the plaintiff in *Lohrmann* did not. Thus, we conclude that appellees presented sufficient evidence to allow a reasonable inference that Knuckles was exposed to asbestos-containing products sold by Porter Hayden.

4.

> Plaintiffs failed to present legally sufficient evidence to establish that they inhaled sufficient respirable asbestos from Eagle–Picher products to render such products a substantial factor in causing them harm.

Eagle–Picher argues that the evidence that its products caused the harm was insufficient in both the *Balbos* case

and the *Knuckles* case. We disagree. As to Balbos, appellees produced witnesses who testified that Eagle–Picher cement was used at the Fairfield Shipyards between 1942 and 1945. As to Knuckles, one of appellees' witnesses testified that Eagle–Picher cement was one of the cements used at Key Highway from 1953 to 1960; another said a particular Eagle–Picher cement was used there for 25 to 30 years; and a third said a type of asbestos covering called "Hylo," manufactured by Owings–Corning Fiberglass and distributed by Eagle–Picher in that company's packaging, was present in the storeroom at Key Highway from 1964 to 1970 and from 1972 to 1982.

Like Porter Hayden, Eagle–Picher argues that even if the evidence was sufficient to place Eagle–Picher products at Fairfield and Key Highway when the decedents worked there, appellees failed to establish that either of the decedents, who did not work directly with asbestos products, actually came into contact with Eagle–Picher's products. Again we point to the expert testimony that asbestos dust can drift "for miles." Because of this evidence, appellees were not required to prove that the decedents actually handled Eagle–Picher's asbestos products.

▋ Eagle–Picher's final argument on this issue is that, even if the decedents did come into contact with some of its products, such contact was not a proximate cause of the decedent's mesothelioma. It bases this argument on the testimony of Dr. Peter Rasmussen, who said that the decedents' diseases were, more likely than not, caused by exposure to amphibole asbestos, rather than to chrysotile asbestos. It argues that because "[t]he principal Eagle–Picher product at issue here contained only chrysotile asbestos," none of the company's products could have been the proximate cause of the decedents' mesothelioma.

Even assuming, *arguendo,* that none of the Eagle–Picher products at issue contained amphibole asbestos, its argument still fails. Dr. Rasmussen stated earlier in his testimony that the literature indicates that all kinds of asbestos,

including chrysotile asbestos, "are capable of causing malignant mesothelioma." Dr. William Nicholson said the same thing during his testimony. A third doctor testified that all of Knuckles's exposures to asbestos were "significant contributing causal factor[s] to the mesothelioma." Thus, it was reasonable for the jury to infer that Eagle–Picher's asbestos-containing products—even if they did contain only chrysotile asbestos—were a proximate cause of the decedents' mesothelioma.

### 5.

The trial court erred in refusing to instruct the jury in respect to the definition of "substantial factor" in the context of asbestos-related diseases.

Celotex assigns as error the trial judge's failure to give the following instruction:

The products of a particular defendant may be considered a cause of an injury only if the exposure was a substantial factor in causing injury.

. . . . .

The word substantial used in this context means that the products must have had such effect in producing harm as to lead a reasonable man to believe exposure to the products by themselves was a direct cause of the injury. Plaintiffs must prove by a preponderance of the evidence that inhaled respirable asbestos fibers from asbestos products of a particular defendant was a substantial cause of the mesothelioma. In order to prove this plaintiffs must show that each of them worked in proximity to any of the defendants' asbestos-containing products with enough frequency and regularity so that the inhaled fibers from the products substantially contributed to the claimed mesothelioma of each plaintiff.

The judge instead instructed the jury as follows with regard to the "substantial factor" issue:

In order for a plaintiff to recover against a particular defendant certain things must ... be proved by the

plaintiffs by a preponderance of the evidence. It must be shown that a product manufactured or supplied by that defendant, by a particular defendant, was a substantial factor in causing the death.

.... If no product manufactured or supplied by a particular defendant was a substantial factor in causing the death then that defendant has no responsibility and the defendant is out right away. Unless there is a product that was manufactured or supplied by a particular defendant which was a substantial factor in causing the death there is no responsibility on the part of that defendant.

On the other hand, the mere fact that a defendant's product was a substantial factor standing alone is not enough. More must be shown because a manufacturer or supplier is not an insurer of its product....

. . . .

There may be more than one cause of an injury or death. That is, several negligent acts or several unreasonably dangerous products may work together. Each person whose negligent act or unreasonably dangerous product has been a substantial cause of the injury or death is responsible.

Celotex contends that this instruction gave the jury no guidance in evaluating the evidence. We disagree and hold that the instruction was proper.

■ We note first that a trial judge need not grant a requested instruction if the matter is fairly covered by the instructions actually given. Md. Rule 2–520(c). In addition, a litigant may only "have his or her theory of the case presented to the jury if that theory is a correct exposition of the law and *if there is evidence in the case that supports the theory.*" *Myers v. Alessi,* 80 Md.App. 124, 130–31, 560 A.2d 59 (1989) (citing *The Sergeant Co. v. Pickett,* 285 Md. 186, 401 A.2d 651 (1979)) (emphasis added).

■ With those principles firmly in mind, we now compare the requested instruction with that actually given.

The requested instruction may be summarized as follows: (1) the product of a *particular* defendant, (2) was a *substantial* factor in causing the plaintiffs' injuries, and (3) each plaintiff worked in *proximity* to these products with *frequency* and *regularity*. We believe the trial judge's instruction clearly covered the first two portions of the requested instruction fairly.

The judge's instruction did not, however, cover the third portion. We believe the judge was correct in omitting any mention of proximity, frequency, and regularity because the evidence did not support this "theory." There was no need for appellees to prove that the decedents were in proximity to any defendant's asbestos products because, as we pointed out in the previous section (Section 4, *supra*), an expert had testified that asbestos dust drifts over great distances.

In addition, appellees were not required to show that the decedents were exposed to the asbestos products frequently or with any degree of regularity. Dr. Nicholson testified that "[f]or the asbestos *cancers* we have no data that would indicate there is a level below which ... there is no risk." (Emphasis added.) A short while later, the same witness said that "mesothelioma can occur from extremely low exposures." Because the decedents died of mesothelioma, an asbestos-related cancer, requiring appellees to prove frequency and regularity of asbestos exposure would have contradicted this expert medical evidence.

We also note that the instruction that Celotex requested was based upon language from *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir.1986). As we noted in the previous section (see Section 4, *supra*), *Lohrmann* is distinguishable from the case before us in that the plaintiff there did not present evidence regarding the distance asbestos dust travels on air currents. More significantly, for purposes of our discussion of the "substantial factor" jury instruction, *Lohrmann* also is readily distinguishable from the case *sub judice* because the injured worker in that case suffered from asbestosis, a noncancerous disease, rather than mesothelioma. A medical expert

testified there that "even thirty days exposure, more or less, was insignificant as a causal factor in producing [asbestosis]." 782 F.2d at 1163. In the case before us, Dr. Nicholson testified that mesothelioma can occur from asbestos exposures that are too low to cause asbestosis. (E.305) Thus, *Lohrmann* is inapposite and provides no support for Celotex's version of the jury instruction.

As the authors, W. Prosser & W. P. Keeton, of *The Law of Torts* (5th ed. 1984) pointed out, "It has been considered that 'substantial factor' is a phrase sufficiently intelligible to furnish an adequate guide in instructions to the jury and that it is neither possible nor desirable to reduce it to any lower terms." *Id.* at 267. That line of reasoning was manifested in the trial judge's comments on the instruction Celotex requested: "[S]ubstantial factor means substantial factor and I think any ordinary person gets the drift of what that means and I don't see where all of the additional language adds a great deal to it." Such logic makes eminent good sense.

### 6.

Plaintiffs failed to present legally sufficient evidence to establish that the defendants' failure to place warnings on their products amounted to negligence.

To have a right of action in negligence, a plaintiff must show (1) that the defendant owed him a duty, (2) that the defendant breached that duty, and (3) that the breach caused harm to the plaintiff. *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 291, 252 A.2d 855 (1969). Two of the appellants appear to argue that appellees failed to meet the second *Myers* requirement; four (including one of the first two) contend that appellees failed to meet the third requirement. We disagree and hold that appellees sufficiently proved that the appellants were negligent in failing to place warnings on their asbestos-containing products.

### A. *Breach of Duty*

■ We said in *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 475 A.2d 1243 (1984), that

> Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn.... And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury.

*Id.* at 423, 475 A.2d 1243 (quoting *Fowler v. Smith*, 240 Md. 240, 246, 213 A.2d 549 (1965) (emphasis in *Fowler* )). We went on to say that the test of legal sufficiency is "whether the evidence serves to prove a fact or permits an inference of fact that would enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover." *Banks*, 59 Md.App. at 424, 475 A.2d 1243 (quoting *Stein v. Overlook Joint Venture*, 246 Md. 75, 81, 227 A.2d 226 (1966)).

In *Moran v. Faberge, Inc.*, 273 Md. 538, 332 A.2d 11 (1975), the Court of Appeals noted that

> a manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others. Whether any such unreasonable risk exists in a given situation depends on balancing the probability and seriousness of harm, if care is not exercised, against the costs of taking appropriate precautions. However, we observe that in cases such as this the cost of giving an

adequate warning is usually so minimal, amounting only to the expense of adding some more printing to a label, that this balancing process will almost always weigh in favor of an obligation to warn of latent dangers, if the manufacturer is otherwise required to do so.

*Id.* at 543–44, 332 A.2d 11 (citations omitted). The Court then quoted *Restatement (Second) of Torts* § 388 (1965), observing that the section had previously been adopted as a general principle in the duty to warn area by previous Maryland cases. Section 388 states as follows:

*Chattel Known to Be Dangerous for Intended Use*

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Following a lengthy review of the case law and the commentaries on the subject, the *Moran* court concluded that

in the products liability domain a duty to warn is imposed on a manufacturer if the item it produces has an inherent and hidden danger about which the producer knows, *or should know,* could be a substantial factor in bringing injury to an individual or his property when the manufacturer's product comes near to or in contact with the elements which are present normally in the environment

where the product can reasonably be expected to be brought or used....

273 Md. at 552, 332 A.2d 11 (emphasis added).

The Fifth Circuit Court of Appeals addressed the issue of what manufacturers "should know" in *Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir.1985). Summarizing the holding in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), the *Dartez* court said,

> *Borel* holds all manufacturers to the knowledge and skill of an expert. They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. Moreover, they each bear the duty to fully test their products to uncover all scientifically discoverable dangers before the products are sold. *Id.* at 1089–90. The actual knowledge of an individual manufacturer is not the issue. If the dangers of asbestos were known to Johns–Manville at the time of Dartez's exposure, then the same risks were scientifically discoverable by other asbestos corporations....

765 F.2d at 461. Thus, the *Dartez* court concluded, "the knowledge of one manufacturer can be a proper basis for concluding that another manufacturer should have warned of a specific danger." *Id.*

Eagle–Picher argues that the trial judge should have granted its motion for judgment because appellees failed to present legally sufficient evidence that Eagle–Picher's failure to place warnings on its products amounted to negligence. According to the company, its conduct "must ... be evaluated in light of what it knew or should have known at and before [the decedents'] last mesothelioma-producing exposure to its products." Eagle–Picher then goes on to discuss various testimony and exhibits which, the company contends, indicate that it neither knew nor should have known that its asbestos-containing products were harmful.

Appellees argue that the evidence they presented at trial was sufficient to permit a reasonable inference that Eagle–

Picher knew or should have known of the dangers regarding its asbestos-containing products, and that the company negligently failed to warn the decedents of those dangers. We agree.

Appellees presented evidence of an article written in 1936 that mentioned patients who had died after prolonged exposure to asbestos dust. Eagle–Picher admits that this article was received by the company's research library in January 1938. Appellees also presented a report, written by an Eagle–Picher salesman named H.M. Aber, to three Eagle–Picher employees in April 1942, telling them of an article he had read on the subject of asbestos. Aber warned, "[I]f you think mineral wool is dangerous you should read this." Thus, it was reasonable to infer that Eagle–Picher had actual knowledge of the dangers of asbestos as early as 1942.

Based upon this evidence, it could reasonably be inferred that Eagle–Picher, in 1938 and even more likely by 1942, knew or should have known of the dangers regarding its asbestos-containing products. Because the dangers were "inherent and hidden," Eagle–Picher had a duty to warn of those dangers. *Moran, supra.* Assuming "all credible evidence tending to sustain the claim of negligence" and drawing "all favorable inferences of fact fairly deducible therefrom tending to establish negligence," we believe there was legally sufficient evidence tending to prove that Eagle–Picher was negligent in failing to provide the decedents with a warning prior to 1964. *Banks v. Iron Hustler Corp., supra.* The trial judge was correct in leaving the weight and value of such evidence to the jury.

Porter Hayden argues that, because it did not actually manufacture asbestos-containing products (it only installed insulation), it did not have the manufacturer's duty to inspect the products. According to Porter Hayden, the trial court should have directed judgment in its favor in the *Balbos* case because appellee in that case failed to introduce evidence that Porter Hayden knew or should have known that its installation work at the Fairfield Shipyards from

1942 through 1944 could injure other workers in the shipyard. We disagree. As the Court of Appeals noted in *Woolley v. Uebelhor*, 239 Md. 318, 325, 211 A.2d 302 (1965),

A vendor of a chattel which another has manufactured who sells it knowing that it is or is likely to be dangerous has the liability of a manufacturer if the dangerous condition causes the chattel to cause harm, Restatement, Torts Sec. 399, and such a vendor, like a manufacturer, is subject to liability if, although ignorant of the dangerous character or condition, he could have by the exercise of reasonable care discovered it by utilizing the peculiar opportunity and competence which he has or should have as a dealer in such chattels. Restatement, Torts Sec. 402. . . .

The predecessor of Porter Hayden, the H.W. Porter Company, was founded by former members of Johns–Manville. The company generally acquired its asbestos-containing materials from Johns–Manville.

Dr. Barry Castleman testified that a 1930 publication called *Asbestos Magazine* included an article on pulmonary asbestosis. According to Castleman,

[W]hat the article says is that some attention is being given by the U.S. Bureau of Labor Statistics of the Department of Labor to pulmonary asbestosis, a disease resulting from exposure to asbestos dust. The bureau urges the establishment of efficient exhaust systems and the introduction of other safety methods.

It goes on to say the disease has been noted in England and much has been written concerning it but this is the first time to our knowledge that it has been officially discussed in this country.

They then go on to talk about British sources describing clinical and chest x-ray appearance in fifteen cases of pulmonary asbestosis and concludes by saying it is said that asbestos dust causes a pulmonary fibrosis attacking the bases of the lungs and like silicosis it is frequently complicated by tuberculosis. . . .

Dr. Castleman testified that a number of companies that mine and manufacture asbestos products, including Johns–Manville, had advertised in that issue of *Asbestos Magazine*. We believe a reasonable inference could then be drawn that Johns–Manville knew or should have known of the contents of this article. A jury also could reasonably infer that Porter Hayden could have discovered this information about the hazards of asbestos "by utilizing the peculiar opportunity and competence which [it] has or should have as a dealer in" asbestos-containing products. *Woolley, supra.* The discovery could have come through discussions with its primary supplier, Johns–Manville, or through reading the article itself. The trial judge did not err in denying Porter Hayden's motion for judgment in the *Balbos* case.

B. *Cause-in-Fact*

■ Most of the appellants point out that there was no evidence that Sutton Knuckles, as an "erector," personally worked with any asbestos-containing insulation products, or that he ever saw the cartons or containers in which appellants' products were delivered to the shipyard. Thus, the appellants argue, "[T]here simply is no rational basis from which it can be inferred that warnings on appellant[s'] products or product containers would effectively warn and protect Mr. Knuckles from airborne asbestos fibers emitted by appellant[s'] product during use."

Celotex makes a similar argument, but its argument appears to apply to both Knuckles and Balbos. All of the appellants, therefore, contend that the appellees failed to provide sufficient evidence that appellants' failure to place warnings on their asbestos-containing products was a cause-in-fact of the decedents' injuries.

Appellees respond by arguing that if the appellants had placed warnings on their asbestos-containing products, insulators and others working directly with these materials would have been prompted to wear protective equipment. According to appellees, Knuckles would have seen the insu-

lators with their protective equipment and taken precautions to protect himself. Thus, the failure to place warnings on the products was a cause-in-fact of the decedents' injuries.

We agree with appellees' reasoning and hold the evidence was sufficient to establish that the lack of a warning was a cause-in-fact of the injuries.

### 7.

The trial court erred in refusing to instruct the jury in respect to the defense of contributory negligence.

As we noted above, Eagle–Picher contends that there was no proof that the decedents were in a position to read and react to the warnings Eagle–Picher began to place on its products in 1964, and that the absence of a warning label earlier, therefore, was not a legal cause of appellees' claimed harm. Eagle–Picher argues, however, that if

the court believes there is sufficient evidence to support an inference that Knuckles [16] may have been in a position to observe warnings had they been in place pre–1964, such would certainly be the case post–1964 and to the extent that Dr. Daum's testimony that "Every exposure contributes" is given any credibility whatsoever, the jury should have been allowed to find that [Knuckles's] post–1964 failure to see, read and heed Eagle–Picher's warning constituted contributory negligence.

Thus, Eagle–Picher argues, the court's refusal to give a contributory negligence instruction in the Knuckles case was error.

The flaw in this argument is that we do not believe Knuckles (or Balbos) was in a position to see warnings no matter when they were placed on Eagle–Picher's products. As we noted in our discussion of whether appellants' failure to place warnings on their products was a cause-in-fact of the decedents' injuries, Knuckles would not have learned of

---

16. Eagle–Picher does not make this argument as to Balbos.

the products' dangers from warnings on the packages. Rather, he would have learned of the dangers when he saw those who worked directly with the products don respirators and other protective equipment.

Thus, Knuckles could not have "fail[ed] to see, read and heed" the warnings Eagle–Picher placed on its products after 1964, as the company contends. The trial judge was correct in refusing to give the contributory negligence instruction.

### 8.

The trial court erred in refusing to instruct the jury that the focus of their analysis of allegedly culpable conduct should be confined to conduct at and before plaintiff's last mesothelioma-producing exposure to asbestos.

Appellant Eagle–Picher contends that "[t]he trial court erred in refusing to instruct the jury that the focus of their analysis of allegedly culpable conduct should be confined to conduct at and before Plaintiff[s'] last mesothelioma-producing exposure to asbestos." According to Eagle–Picher, the court also erred in failing to instruct the jury that it was to evaluate defendants' duty, if any, to warn "bystanders," such as Balbos and Knuckles, rather than workers who actually "used" the products.

With regard to the duty to warn, Eagle–Picher requested that the court instruct the jury as follows: [17]

To show breach of duty to warn plaintiffs must show such defendant, one, knew or had reason to know that it caused or was likely to subject *bystanders* such as Knuckles and Balbos to a risk of mesothelioma; two, defendant had no reason to believe that those who were exposed to the products would realize its dangerous conditions; and, three, the defendant failed to exercise rea-

---

17. The requests actually were made by counsel for some of the other defendants, but counsel for Eagle–Picher then adopted the requests. None of the other appellants appear to raise as error the failure to give these instructions.

sonable care to inform those exposed to the product of the dangerous condition of the product or the facts which made it likely to be dangerous.

In determining whether any defendant breached a duty to warn you must consider what a reasonable manufacturer or supplier of a particular asbestos product should have provided in terms of warnings and precautions in view of the hazard *at and before the time of the plaintiffs' last mesothelioma-producing asbestos exposure.*

Compliance with suggested standards, regulations or recommendations may be considered by you as evidence of whether or not a defendant was free of negligence in marketing and labeling its product.

(Emphasis added.)

Similarly, appellants requested that the court instruct the jury with regard to punitive damages as follows:

In evaluating plaintiffs' punitive damage claim you must only consider conduct which occurred *at or before each plaintiff's last mesothelioma-producing exposure to a particular defendant's product.* Anything done after that date may only be considered to the extent it bears upon earlier conduct within the relevant punitive damages time frame.

Thus, even if you find that a particular defendant committed a bad act for which punitive damages would be appropriate, no such damages may be awarded if the act was committed after plaintiffs' last mesothelioma-producing asbestos exposure.

(Emphasis added.)

The instructions the trial judge gave on the issues of duty to warn and punitive damages were as follows:

A manufacturer or a supplier of a product is negligent if it knew or through the exercise of reasonable care should have known that the product was or was likely to be dangerous to the persons whom it reasonably expected to use the product, had no reason to believe that those

persons would know of the danger and failed to warn them of that danger.

\* \* \* \* \* \*

Now, in order for there to be a right to punitive damages, in order for the plaintiffs to have the right to recover punitive damages, there must be conduct of an extraordinary and outrageous nature. That is, there must be wanton and reckless conduct. Wanton and reckless conduct is more than mere negligence. Wanton and reckless conduct requires direct evidence of substantial knowledge on the part of the manufacturer that the product is or is likely to become dangerous and a gross indifference to that danger.

■ Eagle–Picher contends that the court's refusal to give the requested instructions constituted reversible error. We disagree. As to the language regarding the "last mesothelioma-producing asbestos exposure," we believe that our recent decision in *Myers v. Alessi*, 80 Md.App. 124, 560 A.2d 59 (1989), is controlling. We said in that case that "[a] litigant is entitled to have his or her theory of the case presented to the jury *if that theory is a correct exposition of the law* and if there is evidence in the case that supports the theory." *Id.* at 130–31, 560 A.2d 59 (citing *The Sergeant Co. v. Pickett*, 285 Md. 186, 401 A.2d 651 (1979) (emphasis added). We do not believe that Eagle–Picher's instruction regarding the "last mesothelioma-producing asbestos exposure" is a correct exposition of the law. While no Maryland court has addressed this precise issue, Judge Marshall A. Levin, the asbestos judge/master for the Circuit Court for Baltimore City, denied an asbestos-producing defendant's motion in limine to preclude state of the art evidence after the date of the last exposure to the defendant's product. In his order, Judge Levin relied heavily on *Lockwood v. AC & S, Inc.*, 109 Wash.2d 235, 744 P.2d 605 (1987), which is instructive.

In *Lockwood* the evidence showed that the plaintiff was exposed to asbestos in his work in shipyards in Washington State from 1942 until his disability retirement in 1972. In

that year, he ceased regular smoking, having been a habitual smoker since his teen years, but he occasionally smoked a cigarette thereafter. Lockwood was diagnosed as having asbestosis in 1979.

One of the defendant manufacturers in *Lockwood,* Raymark Industries, Inc. (Raymark), argued that evidence of its knowledge of the dangers of asbestos which it acquired after Lockwood's retirement was irrelevant because, it contended, there was no continuing duty to warn Lockwood of the dangers of asbestos after he was no longer exposed to the product. In concluding that evidence of Raymark's post–1972 knowledge was relevant, the Supreme Court of Washington stated:

We believe that where a person's susceptibility to the danger of a product continues after that person's direct exposure to the product has ceased, the manufacturer still has a duty after exposure to exercise reasonable care to warn the person of known dangers, if the warning could help to prevent or lessen the harm. Such a warning should be required to the extent practicable. Thus, it will depend on the circumstances if a warning to previous users of the product must be made by direct personal contact with such users. Alternative warning methods which may be reasonable in a given situation might include notices to physicians or advertisements.

In this case, in view of the expert testimony at trial that asbestos remains in the lungs long after exposure and that cigarette smoking aggravates asbestosis, we believe that if Raymark had made a reasonable effort to provide Lockwood with the information it acquired about the dangers of asbestos exposure after his retirement, the seriousness of his injury might have been reduced. Under these circumstances, Raymark had a continuing duty to warn Lockwood of the known dangers of its product after he was no longer exposed to it. . . .

744 P.2d at 619.

The appellants in the case before us, including Eagle–Picher, owed a similar duty to exercise reasonable care to

warn Balbos and Knuckles of the dangers of asbestos long after the two men had their last mesothelioma-producing exposures. As appellees correctly point out, if the decedents had been apprised of the dangers to their health, they might have sought medical treatment sooner and thus, perhaps, prolonged their lives.[18]

The trial court's decision not to use the word "bystanders" in its duty to warn instruction, as Eagle–Picher had requested, also did not constitute reversible error. We recognize that there is a difference between the words "bystander" and "user." We also realize that the evidence clearly showed that the decedents were bystanders. The trial judge, therefore, would have been better advised to instruct the jury on the duty that manufacturers owe to such bystanders. As it turns out, however, the judge's failure to use the proper word made no difference. We explain.

We note that manufacturers are no longer liable for negligence only to users and consumers of their products. They also are liable to those whom the manufacturer should expect to be endangered by the products' probable use. W. Prosser & W.P. Keeton, *The Law of Torts* § 100, at 703 (5th ed. 1984) (citing *Restatement (Second) of Torts* § 395 (1965)). "There is no longer any doubt that the negligence liability extends to any lawful use of the thing supplied, as well as to a mere bystander...." *Id. See also Moran v. Faberge, Inc.,* 273 Md. 538, 554, 332 A.2d 11 (1975) (cologne

---

**18.** Eagle–Picher points out that during the trial the judge directed the jury not to consider evidence concerning the state-of-the-art after 1944 in the Balbos case because that was the year Balbos stopped working in the shipyard. Eagle–Picher attempts to use this evidentiary ruling to support its argument that the trial judge erred in failing to give an instruction that the jury should consider only conduct at and before the decedents' last mesothelioma-producing exposure. The ruling, however, does not aid Eagle–Picher's argument. The ruling actually benefitted Eagle–Picher. The only party to be affected negatively was the Balbos estate, which did not appeal the ruling. In any event, our holding, based on *Lockwood,* effectively overrules the trial judge's initial instruction to the jury.

manufacturer was negligent in failing to place on cologne bottle a warning that cologne was highly flammable; manufacturer liable to bystander burned when her friend poured cologne on burning candle).

Because Eagle–Picher and the other defendants owed the same duty to bystanders such as Balbos and Knuckles as they owed to users of their products, it made no difference that the trial judge spoke of "persons whom [a manufacturer'] reasonably expected to use the product," rather than "persons whom a manufacturer reasonably expected to be bystanders near where the product was used."

We also observe that the jury had heard weeks of testimony clearly showing that the two decedents did not actually handle, or "use," the asbestos-containing products. It would have been obvious to anyone in the courtroom that Balbos and Knuckles were "bystanders." It was clear that the persons to whom appellants owed, or did not owe, a duty to warn were the decedents, not some unnamed "users" of the products. As Chief Judge Stedman Prescott opined in *Hartman v. Meadows*, 243 Md. 158, 220 A.2d 555 (1966):

> The average jury of today is composed of intelligent people. For the main part, they generally know and understand what is going on in a trial, and realize the purport of the judge's charge. It is unnecessary, in order not to be misleading or confusing, for the court to set forth in minute detail the limitations of every conceptual interpretation that might be placed upon his charge. The purpose of oral charges is to tell the jury in simple words what the law is in the case before them, and we will not be too particular in criticizing the words used if the result be sufficient. *Lloyd v. Yellow Cab Co.*, 220 Md. 488 [154 A.2d 906] [ (1959) ].

*Id.* at 163, 220 A.2d 555. *See also Lundgren v. Ferno–Washington Co.*, 80 Md.App. 522, 531, 565 A.2d 335 (1989). The result of the trial judge's instruction was sufficient.

Finally, we observe that counsel for Eagle–Picher did not mention the distinction between the terms "user" and "bystander" during the arguments surrounding the motions for judgment and the renewed motions for judgment. It appears that Eagle–Picher did not deem the distinction worthy of mention until after the jury instructions had been given.

We perceive no error in the trial court's refusal to give either the failure to warn instruction or the punitive damages instruction that Eagle–Picher requested.

### 9.

> The trial court erred in failing to give appellants' requested instructions on the sophisticated user and superseding cause defenses.

Appellants Owens–Illinois and Pittsburgh Corning manufactured asbestos-containing products and sold them to Bethlehem Steel. They were defendants in the Knuckles case. Appellants ACandS and Porter Hayden installed asbestos-containing products at Bethlehem Steel shipyards. ACandS was a defendant in the Knuckles case while Porter Hayden was a defendant in both the Balbos and Knuckles cases. The appellants contend that the trial court erred in failing to give appellants' requested instructions on the sophisticated purchaser and superseding cause defenses.

### *Sophisticated Purchaser*

The sophisticated purchaser defense relieves a supplier of its duty to give direct warnings to the employees of a purchaser, when the giving of such direct warnings is not feasible and the purchaser knows of the dangers posed by the use of the supplier's product in the workplace. The appellants allege that Bethlehem Steel was a sophisticated or knowledgeable industrial purchaser aware of the dangers associated with the use of asbestos-containing products. They claim that because Bethlehem Steel was a knowledgeable industrial purchaser, appellants acted reasonably in relying on Bethlehem Steel to protect its employees and thus were relieved of any duty to warn the employees

independently of the dangers associated with the asbestos-containing products supplied by the appellants.

The Court of Appeals has adopted the *Restatement (Second) of Torts* § 388 (1965), as an authoritative statement of the "reasonableness" standard applied in failure to warn cases under all three theories of negligence, breach of implied warranty, and strict liability. *Dechello v. Johnson Enter.*, 74 Md.App. 228, 236, 536 A.2d 1203 (1988) (failure to warn claim brought against an importer who supplied a retailer with the bottle of sparkling wine, out of which allegedly flew a plastic stopper, which injured the plaintiff); *Moran v. Faberge, Inc.*, 273 Md. 538, 544, 332 A.2d 11 (1975) (failure to warn claim brought against a manufacturer of cologne that exploded when it was dripped on a lit candle). The sophisticated purchaser defense relates to clause (c) of *Restatement* § 388. Section 388 in pertinent part states:

*Chattel Known to be Dangerous for Intended Use*

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

. . . .

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

If established by the evidence, this defense negates the essential element of liability that the defendant supplier[19] failed to exercise reasonable care to warn the ultimate user of the product or those endangered by its ultimate use.

---

**19.** The term "supplier" encompasses both the manufacturing and installing appellants in the instant case.

Appellants cite two cases to support their position that the sophisticated purchaser defense applies in this case, *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D. Va.1984), *aff'd sub nom. Beale v. Hardy,* 769 F.2d 213 (4th Cir.1985); *Higgins v. E.I. DuPont de Nemours & Co.,* 671 F.Supp. 1055, 1058 (D.Md.1987), *aff'd,* 863 F.2d 1162 (4th Cir.1988). *Goodbar* involved the delivery of silica sand to a foundry via unpackaged railroad car lots. In *Goodbar* the court applied *Restatement (Second) of Torts* § 388, focusing on the requirements of clause (c), to determine "whether the Defendants failed to exercise reasonable care in relying upon the Foundry to supply its employees with the necessary information to satisfy the duty to warn." *Goodbar,* 591 F.Supp. at 557. The court found that the danger was clearly known to the purchaser/employer and that only the Foundry was in a position to communicate an effective warning to its employees. *Id.* at 566. The court held that the supplier of silica-containing products did not have a duty to warn foundry employees about the dangerous characteristics of silica products.

In *Higgins* fire fighters exposed to glycol-ether-acetate-based paint at a Baltimore fire station brought a products liability suit against the paint manufacturer (Dupont) and the manufacturer's chemical suppliers (Eastman and Union Carbide) for failure to warn the purchaser's employees about the possible teratogenic effects of Imron paint which plaintiffs claimed caused the death of their offspring. *Higgins,* 671 F.Supp. at 1058. The court opined that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense with regard to both negligent and strict liability failure to warn claims, given that the defense logically follows from section 388. *Id.* at 1059. The court restated the "essential premise of this defense: There is no duty on product suppliers to warn ultimate users (whether employees or customers) of product-related hazards in products supplied in bulk to a knowledgeable user. The corollary ... is that this is is [sic] especially the case when the knowledgeable industrial purchaser is the

only one in a position to communicate an effective warning to the ultimate user." *Id.* at 1061. The court granted the suppliers summary judgment based on the sophisticated user/bulk supplier defense on the basis of its findings that:

> Eastman and Union Carbide supplied in bulk, via railroad tank cars and tank trucks, vast amounts of liquid chemicals which were subsequently reprocessed and repackaged by Dupont ... rendering these bulk suppliers unable ... to communicate any warning to the ultimate purchasers. [And these suppliers] reasonably relied on the knowledgeable industrial purchaser DuPont to warn customers....

*Id.* at 1062.

In the instant case, the trial court (Judge Marshall Levin serving as the motions judge), in granting the plaintiffs' motion to exclude evidence of the sophisticated purchaser defense, correctly distinguished these cases from the instant case. The former cases dealt with suppliers of products delivered in bulk via railroad cars where the supplier as a practical matter had no opportunity to effectively warn the ultimate user. In *Goodbar*, the silica-containing sand was unloaded from the railroad cars at the Foundry onto conveyer belts and taken to storage silos. Likewise in *Higgins*, the chemicals were delivered in tank cars, unloaded, and mixed with many other ingredients to make the paint product which was then packaged, labelled and sold by the manufacturer to the consumer. In the case *sub judice*, however, the asbestos-containing products were delivered by the appellants to Bethlehem Steel in their original containers, *i.e.*, bags, cartons, cans, and other packages and placed in warehouses. The evidence presented at trial indicated that the quantity required for a job determined the form in which the product was delivered to the work site. In any case, the storage room and warehouse employees handled the original containers and on occasion so did other workers.

The appellees argue that *Oman v. Johns–Manville Corp.*, 764 F.2d 224 (4th Cir.1985), *cert. denied sub nom.*

*Oman v. H.K. Parker,* 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985), another asbestos case, is apposite. Judge Levin found *Oman* persuasive and so do we. In *Oman* the plaintiffs were shipyard workers who claimed to have contracted asbestosis after being exposed to asbestos fibers in the course of their employment for Newport News Shipbuilding and Drydock Company. *Id.* at 226. The Court, in determining whether the district court "should have charged the jury that the manufacturer's duty to warn the ultimate users ... is satisfied if a sophisticated employer is aware of the dangers involved in the use of the product," discussed the various factors listed in *Restatement (Second) of Torts* § 388 comment n. *Oman,* 764 F.2d at 233.

Comment n to section 388 provides six factors for the court to balance in determining what precautions a manufacturer or supplier of a product must take to satisfy the requirement of reasonable care stated in § 388(c):

(1) the dangerous condition of the product

(2) the purpose for which the product is used;

(3) the form of any warnings given;

(4) the reliability of the third party as a conduit of necessary information about the product;

(5) the magnitude of the risk involved; and

(6) the burdens imposed upon the supplier by requiring that he directly warn all users.

*Oman,* 764 F.2d at 233. In *Oman* the court concluded that the product was very dangerous because it contained asbestos fibers; the burden on the manufacturer of placing a warning on the product was not great; the employer was unaware of the danger until 1964; and that once the employer became aware of the potential danger it failed to convey its knowledge to its employees. *Id.* at 233. The court held that under this set of facts it could not say that the district court erred in refusing to give the charge on the sophisticated purchaser defense to the jury. *Id.*

In this case, we apply the factors to determine whether the appellants failed to exercise reasonable care by relying upon Bethlehem Steel to supply its employees with the necessary information to satisfy the duty to warn.

Since the discovery of the insulating properties of asbestos, asbestos-containing products have fulfilled many important purposes in times of war and peace. In the early 1940's the United States was contemplating and then became involved in World War II. Asbestos-containing insulation was an important component in the construction of military hardware including naval vessels essential to the defense of U.S. security interests. Notwithstanding the purpose served by these products, they were very dangerous.[20] Based on the evidence of the dangers known prior to 1942, and on the holdings in other asbestos cases, asbestos is a very dangerous substance and products containing asbestos are likewise very dangerous if not used properly. *See Oman,* 764 F.2d at 233; *Willis v. Raymark,* 905 F.2d 793, 797 (4th Cir.1990). Even if the dangers were not known in the 1940's, asbestos-containing products were no less dangerous at that time than they are today. Moreover, the magnitude of the risk involved was substantial—serious illness or death.

The evidence indicates that no warnings were even attempted by any of the appellants until well into the 1970's. The burden imposed on the appellants by requiring that they warn the ultimate users or those endangered by the product's ultimate use would not have been great. A warning could have been effectuated by placing a label on the packaging. As the Court of Appeals observed in *Moran v. Faberge, Inc.,* 273 Md. 538, 543–44, 332 A.2d 11 (1975),

---

**20.** The trial court defined a product as unreasonably dangerous if the product is "dangerous and the manufacturer or seller fails to give adequate warning of the product's dangerous condition." Even though in the instant case the jury found that the products were not unreasonably dangerous as defined by the trial court, this finding does not preclude asbestos-containing products from being very dangerous when improperly handled.

when the cost of giving an adequate warning amounts only "to the expense of adding some more printing to a label, . . . this balancing process will almost always weigh in favor of an obligation to warn of latent dangers. . . ." The appellants argue extensively that Bethlehem Steel knew of the dangers posed by the asbestos-containing products in its work place. Yet appellants provide no evidence that at the time of exposure the appellants had reason to believe that Bethlehem Steel would warn its employees. Possession of knowledge by Bethlehem Steel alone is not sufficient to show that appellants reasonably relied on Bethlehem Steel to act as a "conduit" and warn its employees. It was entirely foreseeable that Bethlehem Steel as an employer would not warn its employees. *See Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 496 (3d Cir.1985). In the case of the installation appellants, there is no evidence that the employees of the installers, when handling these products, took precautions to protect themselves, from which we may conclude that appellants themselves failed to warn their own employees. In addition, there is no evidence that the employees of the installers ever saw Bethlehem Steel take any precautions to protect Bethlehem Steel employees when the installers were working in the area. The appellants offered no evidence that they apprised Bethlehem Steel of the dangers, attempted to ascertain whether Bethlehem Steel could reasonably be relied upon to disseminate information about the dangers, or even in fact did rely on Bethlehem Steel to provide warnings to their employees. But, assuming *arguendo,* the appellant had taken these actions, *Restatement* § 388 comment n provides in pertinent part that:

Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. . . .

Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if igno-

rantly used involve grave risk of serious harm to those who use them ... to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character.... [I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful.... Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.

The ignorant use of asbestos-containing products posed grave threats to the life and health of the user and bystanders while the burden upon the appellant suppliers of providing warnings would not have been unduly burdensome.

In summary, as a result of balancing the comment n factors, appellants were not relieved of their duty to bring home to Bethlehem Steel employees the information they needed to protect their lives. We hold that under the facts in the instant case and the clear intent of section 388, the trial court did not err in refusing to give appellant's requested instruction on the sophisticated user defense.

### Superseding Cause

Appellants contend that the evidence adduced at trial concerning Bethlehem Steel's actual knowledge and conduct with respect to the use of the asbestos-containing insulation products in its shipyards tends to show that Bethlehem Steel's conduct was a superseding cause of the decedents' injury and establish that Bethlehem Steel had the sole means and opportunity to warn and protect bystander employees. The appellant argues that the evidence was sufficient to create a jury question and, therefore, to require an instruction to the jury on the application of the superseding cause.

We disagree. A superseding cause instruction is appropriate "where there is reasonable room for disagreement whether the third party action [Bethlehem Steel's failure to warn] ... was extraordinary and not foreseeable, or otherwise fits the legal definition of superseding cause." *Van Buskirk,* 760 F.2d at 496. As the Court of Appeals noted in *Caroline v. Reicher,* 269 Md. 125, 304 A.2d 831 (1973),

> We recognize that a determination of whether the intervening act of a third person is a superseding cause ... may be a question for the trier of fact. But, when the evidence presented and the logical inferences deducible therefrom admit of but one conclusion, the question becomes one of law. It is true that the facts of a case may place it in the middle ground where the issue of the existence of superseding negligence is properly left for the trier of fact; but, some cases are such that they gravitate so close to one or the other of the two poles that resolution of the issue becomes law.

*Id.* at 131 (citations omitted).

The evidence in this case gravitates so closely to one pole that as a matter of law, we conclude Bethlehem Steel's failure to warn its employees of the dangers posed by mishandling asbestos-containing products was not a superseding negligent cause.

The Court of Appeals, in addressing whether the actions of a mother were a superseding negligent cause of her child's injury from consuming lead paint chips, adopted the *Restatement (Second) of Torts* § 447,[21] which governs in-

---

**21.** Section 447 provides:

The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

tervening negligent conduct by a third party generally, and noted the *Restatement (Second) of Torts* § 452,[22] which addresses intervening conduct wherein the third party fails to act to prevent harm. *Caroline*, 269 Md. at 132–33, 304 A.2d 831 (quoting *Farley v. Yerman*, 231 Md. 444, 448–50, 190 A.2d 773 (1963)).

This court applied Maryland's doctrine of superseding cause in *Banks v. Iron Hustler Corp.*, 59 Md.App. 408, 475 A.2d 1243 (1984) (worker injured by conveyor belt brought product liability action against manufacturer of belt). We stated:

> The connection between a defendant's negligence and the plaintiff's injury may be broken by ... a superseding ... cause ... if it so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury.... But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation. Of course, the definition of a superseding cause implies that the defendant's negligence cannot be the cause of the injury.
>
> If the negligent acts of two or more persons, all being culpable and responsible in law for their acts, do not concur in point of time, and the negligence of one only exposes the injured person to risk of injury in case the other should also be negligent, the liability of the person

---

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

**22.** Section 452 states:

(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not. If such a person could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence, the person first in fault is not released from liability by reason of the intervening negligence of another.

*Id.* at 429–30, 475 A.2d 1243 (quoting *State v. Hecht Co.,* 165 Md. 415, 421–22, 169 A. 311 (1933)).

In the instant case, the negligent acts were actually failures to act or, more specifically, failures to warn. The facts of this case fail all the requirements set forth in *Banks* for finding a superseding cause. Bethlehem Steel's failure to warn did not supersede the appellants' failure to warn and was foreseeable. The appellants' failure to warn was an essential link in the chain of causation and a cause of the decedents' injuries. (*See* Section 6, *supra.*) Bethlehem Steel's failure to warn its employees would not have prevented the employees from being alerted to the dangers through warnings provided by appellants. Bethlehem Steel's failure to warn alone would not have produced the injury [23] had not the appellants also failed to warn. Appellants' failure to warn contributed as significantly to the lack of warnings as did Bethlehem Steel.[24] Both the appellant

---

**23.** As the court in *Van Buskirk* stated, "[T]hese are acts of omission, not commission [and n]one of them negates the proposition that had plaintiffs been aware of the danger, they would have taken steps to protect themselves." *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 493 (3d Cir.1985).

**24.** There can be two or more proximate causes of an injury. In *Van Buskirk,* the United States Court of Appeals noted that
sole proximate cause ... is particularly difficult to demonstrate in a failure to warn context, for one must show that the third party's conduct in some way negates the proposition that plaintiffs would have avoided injury had they been appropriately warned. Without evidence supporting such a negation, there may be no finding that the third party's conduct was the only substantial factor, or sole

suppliers and Bethlehem Steel were in a position to ensure adequate warnings and both had the duty to do so. The appellants, as the suppliers, had the first opportunity to place warnings on the product. Their negligent act in failing to warn only exposed the employees to risk of injury in the case that Bethlehem Steel also negligently failed to warn.

Appellants point out that the products were removed from their packaging without the decedents ever seeing the packaging. However, in Section 6 above we concluded that labels would have prompted those handling the products to wear protective gear, thereby alerting bystanders, including the decedents, to take precautions to protect themselves.

Bethlehem Steel's negligent failure to warn was not a superseding cause under *Banks* or *Restatement* § 447 because this negligence was foreseeable and not highly extraordinary. A person of ordinary experience and sagacity acquainted with all the circumstances could reasonably have anticipated that Bethlehem Steel, as an employer, may have failed to warn of the dangerous use of these products. History has shown us that there is nothing highly extraordinary in an employer's failure to maintain a safe workplace. *See also Van Buskirk,* 760 F.2d at 496. As the appellees point out, Bethlehem Steel's failure to warn was particularly foreseeable in that the appellants themselves failed to warn of the hazards of asbestos. Regardless of the conduct of Bethlehem Steel, warnings by the appellants could have alerted the decedents to the dangers. We agree with Judge Marshall Levin that warnings by the appellants would have been just as effective as a warning by Bethlehem Steel. Judge Levin concluded that even though

proximate cause. In the present case, sole proximate cause might have been shown if there were some evidence that [the employer] would have removed the warning labels, or would have forced its employees in some manner to work in direct contact with asbestos against their will.
760 F.2d at 493.

Bethlehem Steel did direct the use of these products and it did control and monitor the workplace, ... the point remains that inevitably the employees ... were obliged to open the various containers and use the asbestos containing products contained therein in the course of their employment. In so doing they allegedly became exposed to the asbestos fibers to their detriment. They became exposed because they opened these containers by cutting ... breaking ... prying ... (and) ripping them open, and otherwise getting to them so that they could apply these products as directed. It was entirely foreseeable by defendants that the above activity would occur. So even if defendants can prove that Bethlehem Steel should have warned its employees of the danger of these products, that does not exonerate the defendants from *their* duty to warn. At the precise point in time that Bethlehem Steel's employees somehow opened these asbestos containing products, there was no warning on any of the containers. If there had been, the employees might have chosen not to handle such products. Put differently, the containers reached the employees in the same condition as when they were shipped ... and thus warning by the defendants would have been just as effective as a warning by Bethlehem Steel.

The appellants argue that Knuckles, in the ordinary course of his work, would not have had the opportunity to see the labels because when the products were delivered to the work area they were not in the manufacturer's packaging. As noted above in Section 6, although the actual warning label may not have been seen by the decedents, precautions taken by the workers who did see the labels would have foreseeably alerted the decedents and effected a warning.

The general rule, as stated in the *Restatement* § 452, is that a third party's failure to prevent harm is not a superseding cause. *See Restatement* § 452(1). The exception to this rule is whether the burden has shifted to a third party because of "a lapse of time or otherwise." *Restate-*

*ment* § 452(2). This exception is not met in this case because as articulated in *Van Buskirk:*

> Where ... a supplier is continually supplying a product with a latent defect in it, and the supplier has reason to know that sufficient precautions are not being taken with respect to the use of that product, there is no good reason, ... to shift the duty to warn.... Where supply is continuous, there is no "lapse of time" that would justify shifting the duty.

760 F.2d at 497 (citation omitted). Although the appellants argue that they were relieved of the duty to warn based on the sophisticated user doctrine, they do not appear to argue that they did not continuously supply Bethlehem Steel with asbestos-containing products over several years. We concluded above that the appellants had no reasonable basis for relying on Bethlehem Steel to act as a "conduit" for warning Bethlehem Steel employees and that the duty to warn did not shift to Bethlehem Steel.

We hold that failure of Bethlehem Steel to act to prevent harm to its employees threatened by the appellants' failure to warn was not a superseding cause. The intervening act or failure to warn by Bethlehem Steel was foreseeable and not extraordinary even if highly irresponsible. The appellant suppliers had an independent duty to warn of the latent dangers of their products and this duty did not shift to Bethlehem Steel.

### 10.

> Plaintiffs failed to present legally sufficient evidence to establish that appellants' conduct was so egregious as to support an award of punitive damages.

In the Knuckles case, the jury assessed punitive damages against Eagle–Picher in the amount of $50,000 and against Owens–Illinois in the amount of $100,000. Wanton or reckless conduct, as opposed to actual malice, will suffice to support an award of punitive damages in a product liability action. *American Laundry Mach. v. Horan*, 45 Md.App. 97, 116, 412 A.2d 407 (1980). Wanton and reckless

conduct, however, requires far more than mere negligence, or what may be causally inferred from it. *Id.* at 117, 412 A.2d 407. It requires *direct evidence* of substantial knowledge on the part of the manufacturer that the product is, or is likely to become, dangerous, and a gross indifference to that danger. *Id.* Under this standard, the plaintiff must prove that the defendant conducted himself in an extraordinary manner characterized by a wanton or reckless disregard for the rights of others. *Exxon Corp. v. Yarema*, 69 Md.App. 124, 516 A.2d 990 (1986). *See also* R. Gilbert, P. Gilbert & R. Gilbert, *Maryland Tort Law Handbook* § 25.3.1 (1986). Appellants Eagle–Picher and Owens–Illinois contend that appellees have not presented any evidence that the appellants had substantial knowledge that the products at issue were dangerous and that there was a gross indifference to that danger.

Appellate courts of our sister states have had occasion to consider whether sufficient evidence was presented to hold various manufacturers of asbestos-containing products liable for punitive damages on the basis of their knowledge of the dangers of asbestos and their failure either to warn employees and customers or eliminate asbestos from their product. Because we are embarking upon uncharted (Maryland) waters as to this issue, we look to these decisions for guidance.[25]

---

**25.** In *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985), the Pennsylvania Supreme Court held that conduct described by an insulation worker who alleged injury as result of exposure to asbestos while installing insulation products, including that corporations had access to literature which discussed generally risks of those who worked with asbestos, that potential hazard attendant to product was so severe, and that consumer could have been given opportunity to guard against disabling exposure to product by manufacturer including simple, adequate warning of acknowledged danger of product, did not demonstrate culpable mental state necessary to prove recklessly indifferent conduct which would permit the jury to award punitive damages.

We *note*, however, that the Court, in a plurality opinion, also held that under Pennsylvania law, appreciation of the risk is a necessary element of the mental state required for imposition of punitive dam-

In *Fischer v. Johns–Manville Corp.*, 193 N.J.Super. 113, 472 A.2d 577 (A.D.1984), *aff'd*, 103 N.J. 643, 512 A.2d 466 (1986), there was evidence that a defendant asbestos supplier had knowledge of asbestos hazards as early as the 1930's and failed to warn users of the hazards. In *Fischer*, the plaintiff's duties required that he regularly handle asbestos in various forms, causing him to inhale asbestos dust. Defendant was aware that these duties were hazardous and had already caused disease in others. In affirming the award of punitive damages, the court stated, "it is indeed appalling to us that Johns–Manville had so much information on the hazards to asbestos workers and that it not only failed to use the information to protect these workers but, more egregiously, that it also attempted to withhold this information from the public." *Id.* at 587.

In *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir.1987), the defendant, a manufacturer of an asbestos fireproofing product called Monokote, contended that the evidence was insufficient to support a finding that it acted willfully, wantonly, or recklessly, because there was no evidence that it had sold Monokote to plaintiff in conscious disregard of known dangers posed by the product. In affirming the lower court's award of punitive damages, the court pointed out that there was ample evidence that appellee knew of the health risks associated with exposure to asbestos at the time it sold the product, knew that the product often failed to bond properly, thus creating a danger that asbestos fibers would be released into the Greenville City Hall, and finally, at the time of the sale, defendant had already developed and begun selling an asbestos-free product in response to concerns and publicity about the health risks associated with asbestos.

The court in *Wammock v. Celotex Corp.*, 835 F.2d 818 (11th Cir.1988), affirmed the lower court's award of punitive damages against a manufacturer of asbestos-containing

---

ages and that *wanton conduct may not be sufficient grounds upon which to assess punitive damages.*

joint compound. The appellate court reviewed evidence presented that appellee knew of the hazards of asbestos exposure in other contexts, such as the hazards faced by miners, plant workers, and others who were exposed to higher concentrations of asbestos fibers than were workers in Wammock's position. The court, however, also considered the testimony of the former director of the Saranac laboratory, who testified that he wrote a letter to the manufacturer prior to 1964, criticizing the company for continuing to sell asbestos products without a warning, and the testimony of a former company officer that the manufacturer had failed to label its products until ordered to do so in 1972 by the government. Even after 1972, the manufacturer did not immediately label its products because customer demand for its products was too great to permit the delay that would result from labelling.

In affirming an award of punitive damages against asbestos-containing product manufacturer Johns Manville, the appellate court in *Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242 (Fla.App. 1 Dist.1984), relied on evidence that the company persisted until the 1960's in suppressing information that asbestos dust and fibers could cause asbestosis. The court also pointed out that the company's medical director recommended the use of warning labels in 1952 or earlier, but his recommendation was rejected because the warnings would have caused decreased product sales. The court further noted a report in the record indicating that the company had a policy of not telling employees about the results of X-rays that showed they were suffering from asbestosis, so they "can live and work in peace and the company can benefit by [their] many years of experience." *Id.* at 250.

### Evidence of Wanton or Reckless Disregard

### A. *Owens–Illinois*

Appellee maintains that the evidence showed the necessary wanton and reckless conduct by appellant Owens–Illinois. In support of this contention, appellee cites

deposition testimony of Willis Hazard which was read into evidence. Hazard worked for Owens–Illinois from 1934 to 1942 and from 1946 to 1974 as an industrial hygienist. He testified that he knew of health problems associated with asbestos as early as 1946. He was aware in 1946 that Owens–Illinois had entered into an agreement with Saranac Laboratory to examine the health risks associated with their asbestos containing product, Kaylo.

Hazard testified that some time "in or around 1948," he learned of the conclusion by Dr. Vorwald, who was associated with the Saranac study, that inhaling Kaylo dust could produce asbestosis in animals, and must be regarded as a potentially hazardous material. After this letter was received, Hazard admitted that Owens–Illinois did not issue any warnings to customers or users of Kaylo, and he did not know whether the company did anything to eliminate asbestos from Kaylo. Appellee also introduced a letter dated March 12, 1943, from Dr. Leroy Gardner of the Saranac Laboratory to Dr. Bowes, Director of Research at Owens–Illinois. The letter, commenting on a synthetic insulating material Owens–Illinois was developing, stated "the fact that you are starting with a mixture of quartz and asbestos would certainly suggest that you have all of the ingredients of a first class hazard." Appellee suggests that this is ample evidence from which a jury could infer that appellant engaged in wanton and reckless conduct.

B. *Eagle–Picher*

In support of their contention that there was also sufficient evidence to sustain the punitive damages award against appellant Eagle–Picher, appellee cites the following evidence which indicates knowledge by Eagle–Picher of the dangers of its product. This evidence included the Aber document, the article "Industrial Dust" by Drinker and Hatch, the pathology of asbestos exposure discussed in Rutherford and Johnstone's "Occupational Medicine and Industrial Hygiene," the testimony of defense witness Kenneth Nelson on minimum standards for U.S. shipyards in

1943 which noted the dangers of asbestos exposure, and the receipt into evidence of the Faciane asbestos suit. In addition, Dr. Barry Castleman, appellees' state-of-the-art witness, testified that there were numerous articles in the medical literature documenting the hazards of asbestos with which appellant was charged with knowledge. Appellee also recapitulates the admission by Eagle–Picher that it did not issue a warning until 1964.

Appellee argues that the jury could infer from the testimony and exhibits noted above that the management at Owens–Illinois and Eagle–Picher knew about the hazards of its asbestos products in the 1940's, yet did not take reasonable precautions to protect the users of these products. This, they assert, was sufficient evidence from which a jury could infer that appellant engaged in wanton and reckless conduct.

Numerous articles in the medical literature were cited by the appellee documenting the hazards of asbestos with which both Eagle–Picher and Owens–Illinois are charged with knowledge. These articles, however, deal with the hazards of prolonged exposure to asbestos in the manufacturing or application process. Appellee does not maintain that any of the literature suggests any danger from exposure to either company's finished product. In fact, appellee does not claim that decedent Knuckles was exposed to levels of asbestos in excess of levels that were generally accepted as safe at the time.

Appellee maintains, however, that Owens–Illinois must be charged with knowledge of the danger of its product Kaylo based on the report received from the Saranac Laboratory concerning its product [26] and the deposition testimony of Willis Hazard, Owens–Illinois' industrial hygienist. The report, however, as does other available medical literature, only documents hazards involved with heavy exposure to

---

**26.** As noted *supra,* Owens–Illinois had entered into an agreement with Saranac Laboratory to examine potential health problems associated with Kaylo.

the product's dust generated during the manufacturing and application process. In fact, Dr. Vorwald, in a letter accompanying the final report from the Saranac laboratory, recommends only that "control measures should be directed to reducing the amount of atmospheric dust, especially at those points of operation where dust is generated." Thus, after a long-term study of the products, there is no suggestion that exposure by a bystander such as Knuckles to the finished product would be hazardous.

As to Eagle–Picher specifically, appellee points us to the Aber document and an intra-office correspondence concerning the warning label Eagle–Picher voluntarily decided to place on its product in 1964. The Aber document is a typed sales contract report dated April 8, 1942, discussing a complaint received by the Texas Board of Health about a different Eagle–Picher product composed mainly of mineral wool. In his report, Aber, a salesman, mentioned that he had read an article on asbestos and told how a copy could be obtained. He stated "if you think mineral wool is dangerous you should read this." Appellee, however, presents no evidence as to what the article says or who besides Aber may have read it. Finally, appellee points us to inter-office correspondence which describes the warning Eagle–Picher proposed to place on its product. The letter, in pertinent part, states "This is large and clear enough type face to be completely legible, yet does not "shout CAUTION from the roof top." Eagle's warning label provided:

CAUTION: This product contains asbestos fibers. Inhalation of asbestos in excessive quantities over long periods of time may be harmful. If dust is created when this product is handled, avoid breathing the dust. If adequate ventilation is not possible, wear respirators approved by the U.S. Bureau of Mines for Pneumoconiosis producing dust.

Appellee does not argue, however, that the warning itself was defective or insufficient to accomplish effectively its goal of alerting users to the dangers of the product.

The present case can be distinguished from the cases above. In those cases, defendants were not just aware of potential hazards of long-term exposure to asbestos but rather there was direct evidence that they possessed substantial knowledge that the product at issue was dangerous and exhibited a gross indifference to that danger. Such "substantial knowledge" and "gross indifference" was demonstrated by conduct such as the withholding of relevant information from employees and the public (*see Fischer, supra; Janssens, supra*); knowledge that product had already caused disease in other employees (*see Fischer, supra*); availability of asbestos free products (*see City of Greenville, supra*); and rejection of the advice of experts, due to profit concerns, to place warning label on the product (*Wammock, supra; Janssens, supra*). There are no such instances of outrageous conduct in the case *sub judice.*

The appellee in the instant case was not involved in the application or manufacture of asbestos-containing products. Appellee has only demonstrated that appellants Eagle–Picher and Owens–Illinois had access to certain literature which discusses generally the risks to employees of prolonged exposure to asbestos products in the application and/or manufacturing process. Thus, appellee has failed to demonstrate through direct evidence that appellants had substantial knowledge of the dangers of their products and that there was gross indifference to that danger. The judgments for punitive damages against Owens–Illinois and Eagle–Picher must be reversed.

11. *Punitive Damages: Failure to State Claim*

12. *Punitive Damages: Unconstitutionality*

13. *Punitive Damages: Due Process—Multiple Punishment*

14. *Punitive Damages: Guidance on Amount of Award*

Appellant Eagle–Picher contends that the trial court erred in denying Eagle–Picher's motion to dismiss Knuck-

les' claim for punitive damages on grounds the complaint failed to state a claim for punitive damages upon which relief could be granted (Issue 11) and in denying its motion to dismiss the claim for punitive damages in that such claim was unconstitutional and in violation of the Maryland Declaration of Rights (Issue 12). Appellant Owens–Illinois also contends that the award of punitive damages violates its right to due process of law by subjecting the defendant to multiple punishments for the same alleged wrong (Issue 13), and violates its right to due process of law because the standards for calculating the sum of the award give no guidance regarding the appropriate amount of punishment (Issue 14). Because we have determined that there is insufficient evidence to support an award of punitive damages, we need not address these issues.

## 15.

The trial court erroneously deprived appellants of their right to participate in the exercise of six peremptory strikes.

 ACandS, Owens–Illinois, Pittsburgh Corning, and Porter Hayden contend that the trial court erroneously deprived the appellants of their right to participate in the exercise of six peremptory challenges.

The right to participate in peremptory challenges is controlled by Md.Rule 2–512(h) which states:

Each party is permitted four peremptory challenges plus one peremptory challenge for each group of three or less alternate jurors to be impanelled. For purposes of this section, several plaintiffs or several defendants shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them separate peremptory challenges not exceeding the number available to a single party....

In the instant case, sixteen jurors (twelve plus four alternates) were needed. Thus, under Md.Rule 2–512(h) the

plaintiff party and the defendant party were each entitled to six peremptory strikes. In addition, the defendant party requested additional peremptory strikes on the basis that the defendants who installed asbestos containing products had interests adverse to the interests of the defendants who manufactured the products. The installing defendants included ACandS, Porter Hayden, and MCIC, which is not an appellant in this matter. The manufacturing defendants included Owens–Illinois and Pittsburgh Corning. Although MCIC was represented by separate counsel (Power & Mosner), the other installation and manufacturing defendants were represented by the same counsel (Whiteford, Taylor & Preston).

At the request of counsel for ACandS, Owens–Illinois, Pittsburgh Corning, and Porter Hayden and counsel for MCIC, the trial court recognized the two sub-entities or co-defendants within the defendant party for the purposes of granting peremptory challenges. Initially, the trial court granted six peremptory strikes to the plaintiffs, and six peremptory strikes each to the manufacturing co-defendant and the installation co-defendant.[27] Thus, a total of eighteen strikes were awarded—six strikes to the plaintiff party and twelve strikes to the defendant party. Without a specific finding of adversity, the trial judge made this decision "in the interest of uniformity ... since that is what the going procedure seemed to be...."

After spending more than a full court day conducting voir dire, the list of veniremen was six names short of the

---

**27.** MCIC's counsel, Power & Mosner, was to be the "sole exerciser" of the strikes granted to the installation co-defendant. Counsel for MCIC represented only an installation defendant while counsel for ACandS and Porter Hayden (Whiteford, Taylor & Preston), also represented manufacturing defendants. Although counsel for the appellants eventually requested that the manufacturing and installation defendants he represented be treated as one entity, it is unclear from the record whether the court intended initially to have MCIC counsel exercise the strikes granted to the installation co-defendant on behalf of all installing defendants including the installation defendants/appellants represented by Whiteford, Taylor & Preston.

thirty-four needed to allow the exercise of the eighteen peremptory strikes originally granted to the three entities (plaintiff, manufacturing co-defendant and installing co-defendant). For this reason, the trial judge reconsidered his initial decision to allow each entity six strikes and proposed that each entity take four strikes. The plaintiff waived voluntarily two of his six strikes but both co-defendants declined to do so. Notwithstanding the co-defendants' decision not to waive two strikes each, the trial judge found that the need for the additional strikes did not warrant the expenditure of judicial time and granted the defendant party as a whole eight strikes. The trial judge then offered the defendant party two options for determining the allocation of the eight strikes: the defendants could divide the strikes among themselves as they saw fit or, alternatively, the trial judge could divide the strikes for them. After discussions among the co-defendants and with the trial judge of the various ways to allocate the eight strikes, the trial judge ruled that each co-defendant would exercise separately four strikes.

The appellants contend that the trial court erroneously deprived them of their right to participate in the exercise of six peremptory strikes.[28] The "[a]ppellant contends that the trial court's resolution to accord appellant only four peremptory strikes was in error in that appellant, under Rule 2–512(h), should have been permitted to participate in the exercise of at least six peremptory challenges."

*Kloetzli v. Kalmbacher*, 65 Md.App. 595, 501 A.2d 499 (1985), *cert. denied*, 305 Md. 621, 505 A.2d 1342 (1986), provides guidance on the appropriate inquiries with which to begin our analysis of the number of peremptory strikes the appellant/co-defendant was entitled to exercise. In *Kloetzli*, this court held that

---

**28.** The appellants do "not contend that the trial court was *required* to award each group of adverse defendants the total number of strikes, in this case six, to which all defendants would have been entitled collectively ... [but rather] contend that they were entitled to *participate in the exercise* of six peremptory strikes...."

the determination of whether multiple plaintiffs or multiple defendants are entitled to additional challenges under Rule 2–512(h) involves a two step process. First, the court must make a factual finding of adverse or hostile interest, and second, the court, in its discretion, must determine whether that interest would justify allowing the added challenges.... [T]he burden of establishing the existence of that adverse or hostile interest is upon the proponent of the request.

*Id.* at 599, 501 A.2d 499. To determine whether there was hostility or adverse interest for the purposes of Rule 2–512(h), we examined the pleadings; the nature of the codefendants' representation, namely, whether they were represented by the same or independent counsel, and the nature of the claims. *Id.* at 600, 501 A.2d 499.

In the instant case, the appellants/co-defendants bore the burden of proving the existence of adversity or hostility. During colloquy, the appellants/co-defendants made bald assertions of adversity stating as reasons for adversity that "manufacturers do not think the same way as the installers"; "certain evidence is contested by different lawyers representing different companies"; "some defendants are not named, others are named in both cases." The appellants/co-defendants presented no evidence on the crossclaims between the co-defendants or how the crossclaims or nature of the claims proved adverse or hostile interests. We agree with the finding of the trial judge that the initial distinction between the manufacturing and installing co-defendants was artificial as evidenced by the fact that counsel for appellants/co-defendants represented clients from both camps. Representation of manufacturers and installers by the same counsel was inconsistent with a finding of adversity or hostility. As noted in *Kloetzli,* "Adverse means '[h]aving opposing interests; having interests for the preservation of which opposition is essential.' *Black's Law Dictionary* 49 (rev. 5th ed. 1979). Hostile is defined as '[h]aving the character of an enemy; standing in the relation of an enemy.' *Id.* at 664, 501 A.2d 499." *Kloetzli,* 65 Md.App. at 600, 501 A.2d 499. Clearly, if the interests of

manufacturers and installers were able to be represented by the same counsel, any conflict of interest that might have existed was not sufficient to warrant a finding of adverse or hostile interests.[29] In addition, counsel for the appellants/co-defendants specifically requested that the manufacturing and installing defendants he represented be treated as one entity to avoid any appearance of conflict.

The appellants contend that because the trial court awarded additional strikes, the trial court implicitly found adversity between co-defendants. To support this contention, the appellants cite *Kloetzli*, in which the court stated "Implicit in the allowance of the separate challenges was a determination that the parties' interests were adverse or hostile.... [T]he Rule does not require that an express determination be made." 65 Md.App. at 599, 501 A.2d 499. In the instant case, however, the judge expressly stated that he had not ruled that adversity or hostility existed between the co-defendants but merely had accepted agreement between counsel to provide the plaintiff and each co-defendant with six strikes. That which is implicit is readily distinguishable from the explicit. Thus, *Kloetzli* is distinguishable from the instant case.

The trial court was correct in concluding that the interests of the co-defendants were not adverse or hostile and therefore the eight peremptory strikes awarded to the defendant party exceeded the six peremptory strikes to which the defendant party was entitled under Rule 2–512(h). But even assuming *arguendo* that adverse or hostile interests had been found between the co-defendants, the number of strikes exercised by the appellants/co-defendant were still sufficient to meet the requirements of Rule 2–512.

Under the Rule, it is the party[30] that is entitled to the strikes and not the individual co-defendants, regardless of whether or not their interests are adverse or hostile. The

---

**29.** Both manufacturing and installing co-defendants were represented by the same counsel on all issues except punitive damages.

**30.** "Party" refers to all plaintiffs or all defendants.

rule allows the trial court in its discretion to allow the co-defendants [31] to exercise separately the strikes granted to the party. In *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 74 Md.App. 353, 537 A.2d 1196 (1988), *rev'd on other grounds*, 318 Md. 337, 568 A.2d 35 (1990), we restated the two-step process used in *Kloetzli* for matters involving multiple litigants under Rule 2–512(h) and noted that once the court finds adverse interests "[i]t is then totally within the court's discretion as to whether that interest justifies allowing the additional challenges." *St. Luke*, 74 Md.App. at 363, 537 A.2d 1196 (citing *Kloetzli*, 65 Md.App. at 603, 501 A.2d 499). The decision to award additional challenges and the number of additional challenges to be awarded are totally within the discretion of the trial court. *See Kloetzli*, 65 Md.App. at 604, 501 A.2d 499; *St. Luke*, 74 Md.App. at 363–64, 537 A.2d 1196. If adversity or hostility is found, the trial court, in its discretion, may simply divide the strikes to which the party is entitled among the co-defendants allowing each to exercise its allotted strikes separately or the court may grant additional strikes to the party to be exercised separately by the individual co-defendants.[32]

The only limit placed on the discretion of the trial judge is that the number of challenges to be exercised separately by an adverse co-defendant may not exceed the number available to a single party. In this case the number available to a single party was four. The function of the peremptory

---

**31.** The Rule applies to both "co-plaintiffs" and "co-defendants" but for the sake of simplicity we use only the latter form in our discussion.

**32.** In the case before us, the trial judge did "accept the statement of counsel that, to some extent, there are conflicting interests" and for that reason determined that eight was the appropriate number of total strikes to grant to all defendants. This granting of two additional challenges would have been an appropriate exercise of the trial judge's discretion had he found adverse or hostile interests.

The fact that the trial judge did award additional strikes without finding adversity, raises the question of whether a finding of "some conflict" was sufficient to justify the granting of additional peremptory challenges. But that issue is not before us on appeal.

strike privilege is to "eliminate extremes of partiality and to assure the parties that the case is decided solely on the basis of the evidence." *Vaccaro v. Caple,* 33 Md.App. 413, 416, 365 A.2d 47 (1976). In *St. Luke,* 74 Md.App. at 364, 537 A.2d 1196, after the court determined that the trial judge erred by granting the plaintiff twice as many strikes as given to each co-defendant, the court next determined whether the deviation was so significant as to impair the peremptory privilege on behalf of the co-defendant. In the instant case the appellants/co-defendant's participation in only four strikes did not impair their peremptory privilege. The four strikes exercised equally by each co-defendant and the plaintiff ensured that "the full impact of the parties' participation in the selection of the jury" was not diluted and that neither the other co-defendant, nor the plaintiff "had more to say about who would ... sit on the panel than" the appellant. *King v. State Roads Comm'n,* 284 Md. 368, 372, 396 A.2d 267 (1979). In addition, the impartiality of the list of veniremen was safeguarded by the fact that any conflicting interests between the co-defendants were minimal while their overlapping interests were significant and the co-defendants together exercised eight strikes. We hold, therefore, that even if adversity or hostility had been found, the court acted properly in permitting each co-defendant to exercise four strikes separately.

16.

The trial court erred in ruling that plaintiffs could read certain deposition testimony of Dr. Daniel Braun and in ruling inadmissible other inconsistent deposition testimony of Dr. Braun offered by Eagle–Picher.

A. *The 1985 Deposition*

 The trial court permitted counsel for appellees to read from Dr. Daniel Braun's 1985 deposition, at which Eagle–Picher was represented by counsel, taken in connection with a different case. At the time of the deposition, Dr. Braun had been president of the Industrial Health Foundation (IHF) since 1972. For many years, IHF has mailed to its member companies a digest containing, among

other things, abstracts of articles discussing asbestos. Appellees attempted to show through Dr. Braun's testimony that Eagle-Picher was once an IHF member and, therefore, that Eagle-Picher should have been aware of the contents of digest articles concerning asbestos. The most significant portion of Dr. Braun's testimony was his identification of a stack of index cards, each containing the name of a former IHF member, the date the company joined IHF, and the date the company resigned. One of the cards contained the name and relevant dates for Eagle-Picher.

At trial in the case before us, counsel for Eagle-Picher objected to the admission of Dr. Braun's 1985 deposition generally. Counsel also objected, more specifically, to the reading of Dr. Braun's deposition testimony concerning the index cards of former members and the admission of the cards themselves into evidence. The grounds for Eagle-Picher's objections can be summarized as follows:

1. Dr. Braun's testimony during the 1985 deposition conflicted with testimony he gave in depositions in 1977 and 1980.

2. Appellees failed to produce someone to show that the 1985 deposition was "what it purport[ed] to be."

3. Dr. Braun did not become president of IHF—and thus "keeper" of the index card box—until 1972. He therefore could not testify from personal knowledge that the index cards made before 1972 "were made at or near the time of the transaction."

4. No identifying marks identified the stack of index cards as an exhibit from the 1985 deposition.

5. The Eagle-Picher membership card indicated that the specific IHF member had been Eagle-Picher's chemicals and metals division, rather than the fibers division, which was the only division that manufactured asbestos.

6. Dr. Braun did not testify that the membership cards were created as "a memorandum of a transaction at or near the time the transaction occurred."

The trial judge overruled Eagle-Picher's objections to the 1985 deposition. Such evidentiary rulings were correct

because all of the grounds for the objections could have been obviated or removed if Eagle–Picher had presented them at the time of the deposition. Md.Rule 2–415(g).

### B. *The 1977 and 1980 Depositions*

██ Following the trial court's rulings on the 1985 deposition, counsel for Eagle–Picher requested permission to enter into evidence excerpts from two depositions Dr. Braun gave in 1977 and 1980. Like the 1985 deposition, these were taken in connection with cases other than the two before us. Dr. Braun's statements in the two excerpts, particularly the one from the 1977 deposition, appear to be inconsistent with his implication that Eagle–Picher was a member of IHF. The trial judge denied counsel's request because Dr. Braun had not been given an opportunity to explain his earlier statements.

On appeal, Eagle–Picher acknowledges that a witness must be confronted with a prior inconsistent statement before it can be used to impeach him. As the Court of Appeals pointed out in *Pettie v. State*, 316 Md. 509, 560 A.2d 577 (1989),

> [R]equiring a foundation makes perfect sense for reasons of fairness "in order that the witness may be enabled to refresh his recollection in regard to such statements, and be afforded the opportunity of making such explanation as he may deem necessary and proper."

*Id.* at 514, 560 A.2d 577 (quoting *State v. Kidd*, 281 Md. 32, 46 n. 8, 375 A.2d 1105, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977)). *See also Campbell v. Patton*, 227 Md. 125, 141, 175 A.2d 761 (1961); L. McLain, *Maryland Evidence* § 613.1 (1987); IIIA *Wigmore on Evidence* § 1025, at 1020–21 (Chadbourn rev. 1970); 81 Am.Jur.2d *Witnesses* § 606, at 615 (1976).

Eagle–Picher argues, however, that "if ... the inconsistent statement is one made under oath, in a judicial proceeding, no such requirement exists." In support of this proposition, Eagle–Picher cites only *Ecker v. McAllister*, 45 Md.

290 (1876). *Ecker* is distinguishable from the case before us, however, in that the deponent in *Ecker* testified in person at the trial and was asked by counsel if he made the assertions (in that case, answers to interrogatories) that counsel wished to use to impeach his trial testimony. *Id.* at 304. Thus, the *Ecker* court did not address the issue central to our discussion here: whether a witness's prior inconsistent statements are admissible to impeach him when his only testimony at trial is in the form of a deposition and counsel attempting to impeach the deposition testimony does not call the deponent to the stand and confront him with his prior statements. The Court of Appeals dealt directly with this issue in *Matthews v. Dare*, 20 Md. 248 (1863), saying,

> By the well settled rules of law, [impeaching a witness through prior inconsistent statements] is not allowed, unless a proper foundation be previously laid by interrogating the witness on the subject of the alleged variance, and affording him an opportunity for explanation.
>
> In our opinion the same rule governs when the testimony of the witness is taken under a commission, as where he is examined on the stand at trial....

*Id.* at 269 (citations omitted).[33] Counsel for Eagle–Picher attempted to impeach Dr. Braun's deposition testimony by introducing prior inconsistent statements from Braun's 1977 and 1980 depositions without affording him an opportunity to explain the statements. Thus, the trial judge was correct in denying counsel's request that the 1977 and 1980 excerpts be admitted.

C. *Eagle–Picher's Motion to Strike the 1985 Deposition*

 Appellees authenticated the IHF digests through the reading of the deposition of Jane Brislin, IHF's director

---

**33.** Wigmore cites *Matthews* for the proposition that, in Maryland, a deponent must be asked whether he or she made the supposedly inconsistent statement. IIIA *Wigmore on Evidence* § 1031, at 1036 n. 1.

of information services. The trial judge ruled that the digests were only admissible against the parties who were present at the Brislin deposition. Eagle–Picher was not present at Brislin's deposition; thus, the IHF digests were not admitted in evidence against it. In a footnote, Eagle–Picher contends that it moved to strike the Braun testimony, and the card showing that Eagle–Picher once was an IHF member, because the damaging digests were not admissible against Eagle–Picher and were thus irrelevant as to Eagle–Picher. According to Eagle–Picher, the trial judge denied this motion. .

On this point, we note first that Eagle–Picher specified a number of grounds upon which it objected to the admission of the 1985 deposition and the IHF membership card. (See the list in Section 16A, entitled "The 1985 Deposition," *supra.*) A careful review of the record extract, however, reveals no objection based on an argument that the deposition and the card were irrelevant due to the inadmissibility of the IHF digests against Eagle–Picher. "Where a party specifies the grounds for objection, as appellant did at the trial below, he is bound to that ground and waives any other objections not stated." *Braxton v. State,* 57 Md.App. 539, 556, 470 A.2d 1327 (1984). Eagle–Picher already has waived the objection it now raises on appeal.

If indeed Eagle–Picher did move to strike the 1985 deposition and the membership card on grounds of relevancy, we still would not decide the issue because Eagle–Picher failed to reproduce either the motion or the trial judge's denial of the motion in the record extract. Maryland Rule 8–501 mandates that "[t]he record extract shall contain all parts of the record reasonably necessary for the determination of the questions presented by the appeal." As the Court of Appeals pointed out in *Caroline v. Reicher,* 269 Md. 125, 137, 304 A.2d 831 (1973), "The cases are legion in this Court in support of our authority not to decide issues not presented in conformity with this rule."

Finally, we observe that the trial judge specifically instructed the jury to consider the evidence from the Brislin

deposition only against three of four of the defendants that he named. Eagle–Picher was not among the defendants the judge listed. We conclude that even if Eagle–Picher's IHF membership card and Dr. Braun's 1985 deposition testimony pertaining to Eagle–Picher were irrelevant, the error in admitting them was harmless. *See Proctor v. Holden,* 75 Md.App. 1, 15–17, 540 A.2d 133, *cert. denied,* 313 Md. 506, 545 A.2d 1343 (1988) (even assuming testimony about resale price of disputed home was irrelevant, error in admitting testimony was harmless in light of trial judge's corrective instructions).

17.

The trial court erred in ruling that conservation orders published in the Federal Register regulating use of asbestos from 1942 to 1945 could not be presented to the jury.

██ In January 1942 a federal agency (apparently the Office of Production Management) published in the Federal Register a "conservation order," which stated, in part, that:

Whereas national defense requirements have created a shortage of certain types of asbestos for the combined needs of defense, private account, and export; and the supply now is and will be insufficient for defense and essential civilian requirements unless their use in certain products manufactured for civilian use is curtailed; and it is necessary in the public interest, to promote the defense of the United States, to conserve the supply and direct the distribution thereof. . . .

At trial, counsel for Eagle–Picher requested that the judge take judicial notice of this and other, apparently similar, conservation orders. Counsel for appellees objected on the grounds that, *inter alia,* the conservation orders were irrelevant. In response to the trial judge's request for an explanation of the orders' relevance, counsel for Eagle–Picher said that the orders

provide a framework for the evaluation of conduct that occurred over 40 years ago. . . . Here is a law that says that asbestos is essential and we have got to conserve it.

I think that that bears on the entire country's mind-set toward whether this is a dangerous substance that has to be tested and we have to determine whether or not somebody, 30 years from now somebody is going to get sick from it. I think that is the farthest thing from anybody's mind in 1942 and these regulations tend to bear that out and the conduct that is being evaluated should be evaluated in that framework.

The trial judge sustained appellees' objection to the conservation orders. Contending, on appeal, that the trial judge erred in his ruling, Eagle–Picher again argues that the conservation orders were relevant evidence. We note first that "[t]rial judges are vested with wide discretion as to rulings on the relevancy of proffered evidence." *Fleming v. Prince George's County*, 277 Md. 655, 680, 358 A.2d 892 (1976). *See also McCray v. State*, 305 Md. 126, 133, 501 A.2d 856 (1985); *Fidelity Deposit Co. v. Olney Associates, Inc.*, 72 Md.App. 367, 372, 530 A.2d 1 (1987). Thus, we would only conclude that the trial judge erred if we perceived an abuse of discretion. We perceive no such abuse of discretion. As Eagle–Picher appears to admit, no evidence was produced to show that Eagle–Picher relied upon the conservation orders in any way. In addition, the fact that a federal regulation required Americans to conserve asbestos had no bearing on the central issue in the cases before us: whether Eagle–Picher and the other defendants were negligent in failing to warn Balbos and Knuckles about the dangers of asbestos. Nothing in the one conservation order reproduced in the record extract precluded Eagle–Picher from placing warnings on their products. We have no reason to believe the other conservation orders contained a prohibition against such warnings either.

18.

The trial court erred in ruling that documentary evidence from the Asbestos Textile Institute was admissible against Eagle–Picher.

The Asbestos Textile Institute (ATI) is a trade association of asbestos textile manufacturers and miners of asbestos

fiber. Through the deposition of Doris Fagen, ATI's executive secretary, the appellees introduced minutes of various ATI meetings. The most damaging of these documents was from a February 1971 meeting at which an ATI member named Dr. J.C. Goodman criticized Dr. Erving J. Selikoff, who was publicizing the links between asbestos and diseases. Goodman stated, *inter alia,* that "Dr. Selikoff is a ... dangerous man, and the asbestos industry is going to have to learn to combat his tactics."

Fagen testified in her deposition that all ATI members receive copies of the minutes of the meetings. Eagle–Picher is not a member of ATI. On appeal, Eagle–Picher argues (1) that Fagen's deposition was never admitted against Eagle–Picher and thus never authenticated against that appellant, and (2) that the minutes of the ATI meetings were irrelevant as to Eagle–Picher and should not have been admitted against it.

### A. *Fagen's Deposition*

In contending that Fagen's deposition was not admitted against it, Eagle–Picher points to only one page of the record extract for support. On that page, counsel for appellees announced to the jury that the deposition was being offered "against Raybestos Manhattan and H.K. Porter Company." Counsel made no mention of Eagle–Picher at that point.

This page, however, does not resolve the issue. Only moments before appellees' counsel made that statement to the jury, the trial judge said, "It seems to me the safest thing to do is to offer [the deposition] against those who were present at the deposition." [34] When the judge then asked appellees' counsel to list the parties who had attended the deposition, counsel included Eagle–Picher.

---

**34.** Earlier in the discussion preceding the reading of Fagen's deposition, the judge had said, "The deposition comes in as evidence of those parties who were represented at the deposition. If they weren't represented at the deposition, that evidence can't be used against them."

Following the reading of Fagen's deposition, the discussion turned to admission of the ATI minutes themselves. The trial judge again asked appellees' counsel which parties had been at the deposition. Counsel obliged by listing Eagle–Picher, H.K. Porter, Raymark, Owens–Corning, and Pittsburgh Corning. Of these companies, only Raymark and H.K. Porter appear to have been members of ATI and thus recipients of the ATI minutes. The judge then instructed the jury as follows:

Members of the jury, the evidence, which the Plaintiff is now about to present to you through the reading of documents, is introduced first against these two defendants, Raymark and H.K. Porter as evidence of knowledge of the contents of those documents. As to H.K. Porter and Raymark, the evidence comes in as evidence of knowledge of those two defendants of what is in those documents.

Now, *with respect* to the three defendants, *Eagle–Picher*, Owens–Corning, and Pittsburgh Corning, *that same evidence comes in for a different purpose, not as evidence of knowledge of what is in those documents, but as evidence of what was known at that time as shown in those documents, and as evidence of what other manufacturers could have known. Evidence of knowledge that existed and was available as to Eagle–Picher,* Owens–Corning, Pittsburgh Corning. The evidence does not come in as to any other defendant.

(Emphasis added.)

The trial judge did not state specifically, before Fagen's deposition was read, against which defendants the testimony was being admitted. The fact that appellees' counsel mentioned only Raybestos Manhatten and H.K. Porter, is not dispositive. We believe that the trial judge, in stating that the ATI minutes were admissible against Eagle–Picher and the other non-ATI members, albeit for the limited purpose noted above, was also effectively ruling that Fagen's deposition was admissible against the same defendants.

Alternatively, Eagle–Picher argues on appeal that its objection to the reading of Fagen's deposition should have been sustained because counsel for appellees "did not demonstrate that Fagen was dead, or out of state, nor proffer what, if any, efforts were made to produce her to testify live."

We note first that, other than the issues of the trial court's jurisdiction over the subject matter or over the person, an appellate court ordinarily will not decide an issue

> unless it *plainly* appears by the record to have been *raised in or decided* by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

Md.Rule 8–131(a) (emphasis added). In discussing a precursor to Rule 8–131(a) in *Clayman v. Prince George's County,* 266 Md. 409, 292 A.2d 689 (1972), the Court of Appeals opined that one of the principal purposes of the provision was

> to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.

*Id.* at 416, 292 A.2d 689. *See also Braxton v. State,* 57 Md.App. 539, 549, 470 A.2d 1327, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984). The Court in *Clayman* refused to decide the issue of standing because, *inter alia,* nothing in the record showed that the issue had been argued at the trial; thus, the issue had not been tried and decided by the trial court. *Clayman,* 266 Md. at 416, 292 A.2d 689.

In objecting to the reading of the deposition, Eagle–Picher's counsel mentioned nothing about a failure by appellees to demonstrate that Fagen was dead or out of state, or what efforts appellees had made to produce her to testify live. Counsel said only that

> [opposing] counsel failed to lay the proper foundation for the admission of depositions in evidence, he will fail to

show that they are admissible under Maryland Rules, and he cannot show the necessary prerequisites in admissibility otherwise ... with respect to showing that the deposition is what it purports to be.

Had this been all that was said, then the argument now raised specifically for the first time might have been preserved. We note, however, that Eagle–Picher never returned to this contention and never sought or obtained a ruling by the trial judge. Immediately prior to that statement, there was a lengthy discussion which focused on who attended the deposition and who were members of ATI. Immediately after the above-recited Eagle–Picher objection, all counsel immediately returned to a further lengthy discussion (consuming at least 20 pages of trial transcript), focusing totally upon who attended and against whom the deposition was being offered, and thus diverting attention away from any question of Fagen's availability that might have otherwise been subsumed within the general complaint about lack of foundation. Because the trial judge never had any practical opportunity to correct any error as *now* alleged, we will not decide the issue. *See Braxton*, 57 Md.App. at 549, 470 A.2d 1327.

We point out, however, that the case Eagle–Picher cites in support of its argument, *Myers v. Alessi*, 80 Md.App. 124, 560 A.2d 59, *cert. denied*, 317 Md. 641, 566 A.2d 101 (1989), is clearly distinguishable from the case before us. The plaintiffs in that case attempted to enter into evidence the transcript of testimony by a medical expert who lived outside of Maryland. The trial court ruled that the testimony was inadmissible, and we affirmed. A major reason for our decision, however, was that the defendant needed to cross-examine the medical expert. *Id.* at 139, 560 A.2d 59. In the case *sub judice*, Eagle–Picher has expressed no such need to cross-examine Doris Fagen. Appellants have yet to assert any harm resulting from the non-presence of Doris Fagen. Assuming, arguendo, that the subject objection

was preserved, any error surrounding the admission was harmless.

B. *Relevance of ATI Minutes*

 Eagle–Picher also argues that, because it was neither a member of ATI nor an asbestos tile manufacturer, the ATI minutes were not relevant as to it. According to Eagle–Picher, "Tarring Eagle–Picher with the same brush as the ATI members by admitting this material in evidence against it was error warranting reversal." In the jury instruction quoted above, however, the trial judge clearly distinguished between the members of ATI and those non-members, like Eagle–Picher, who simply attended Fagen's deposition. The judge emphasized that the ATI minutes were only admissible against Eagle–Picher as evidence of what was known at the time of the ATI meetings and, thus, what non-ATI manufacturers could have known.

Judge Marshall Levin, in a memorandum opinion and order in another Baltimore City asbestos case, ruled that "what was known by any one manufacturer at a given point in time is relevant evidence of what was scientifically discoverable and knowable to all manufacturers of asbestos products at the same point in time." *Cain v. Eagle–Picher Industries* (Circuit Court for Baltimore City, Nos. 85056065, 85066065, 84319072, October 5, 1988) (memorandum opinion and order). In reaching this conclusion, Judge Levin found persuasive the reasoning in *Dartez v. Fibreboard Corp.,* 765 F.2d 456 (5th Cir.1985). In that case, the plaintiff attempted to introduce into evidence the deposition of Johns–Manville's former medical director concerning his knowledge of the relationship between asbestos and disease. The defendant, who did not include Johns–Manville, argued that the medical director's testimony was inadmissible because, *inter alia,* it was irrelevant. *Id.* at 461. The Fifth Circuit disagreed, saying:

Defendants contend that Smith's testimony is irrelevant because it relates only to Johns–Manville. Their contention reflects a misunderstanding of a critical issue in any

product liability action: the state of the art pertaining to any possible risks associated with the product. Dartez was required to establish that the dangers of asbestos were reasonably foreseeable or scientifically discoverable at the time of his exposure before these defendants could be found liable. *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

> *Borel* holds all manufacturers to the knowledge and skill of an expert. They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. Moreover, they each bear the duty to fully test their products to uncover all scientifically discoverable dangers before the products are sold. *Id.* at 1089–90. The actual knowledge of an individual manufacturer is not the issue. If the dangers of asbestos were known to Johns–Manville at the time of Dartez's exposure, then the same risks were scientifically discoverable by other asbestos corporations. Therefore, the testimony of the medical director of the industry's largest member is relevant to plaintiff's attempt to meet the evidentiary burden defined by *Borel.*

*Id.*

Like Judge Levin, we also find the *Dartez* court's reasoning persuasive. The ATI minutes were evidence of what was known by ATI members at the time of the meetings. As a manufacturer, Eagle–Picher was obliged to keep abreast of what other manufacturers knew about its product, asbestos. That Eagle–Picher might have been tarred by the ATI members' contemplated tactics against critics does not diminish the relevance of the subject evidence. As we noted earlier, "[t]rial judges are vested with wide discretion as to rulings on the relevancy of proffered evidence." *Fleming v. Prince George's County,* 277 Md. 655, 680, 358 A.2d 892 (1976). The trial judge did not abuse his discretion.

19.

The trial court committed an abuse of discretion by admitting into evidence a videotape depicting Leslie Balbos on his deathbed.

Appellant Porter Hayden contends that the trial court committed an abuse of discretion by admitting into evidence a videotape depicting Leslie Balbos on his deathbed. The video, which ran for approximately one minute, depicted Balbos comatose, in a hospital bed just one day before he died. Appellant asserts that any probative value this evidence may have had was far outweighed by the inflammatory and prejudicial nature of the video and by the extreme sympathy and emotion it was calculated to instill in the jury. It further argues the video was cumulative of both the testimony and documentary evidence concerning Balbos's condition during the latter days of his illness. Appellant requests that we reverse and remand for a new trial.

The decision whether to admit evidence depicting the condition of victims is left to the sound discretion of the trial court and will not be disturbed on appeal unless plainly arbitrary. *Fuget v. State,* 70 Md.App. 643, 653, 522 A.2d 1371 (1987); *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985). In *Nolan v. Dillon,* 261 Md. 516, 276 A.2d 36 (1971), in upholding the admissibility of three photographs of an injured hand, which photographs had been taken prior to the amputation of fingers, the Court of Appeals stated:

> There is no contention that these do not fairly and accurately depict the condition of the hand at that time, and photographs which meet this test are not impermissibly inflammatory. Such matters must be left largely to the trial court's discretion. . . . We have examined the photographs and find no abuse of discretion here.

*Id.* at 527, 276 A.2d 36. Appellant does not contend that the video did not fairly represent decedent's condition. Furthermore, as the Court of Appeals stated in *Johnson, supra,* all photographic evidence is in some sense cumula-

tive. The very purpose of such evidence is to clarify and communicate facts to the tribunal more accurately than by mere words. *Johnson,* 303 Md. at 503–04, 495 A.2d 1. We perceive no abuse of discretion in the trial court's decision to admit the videotape of Leslie Balbos into evidence.

### 20.

The trial court erred in denying defendants' motions for judgment in respect to Anne Balbos's wrongful death claim since plaintiff failed to present legally sufficient evidence to establish the amount of damages to which the Estate of Anne Balbos was entitled on account of Leslie Balbos's death.

■■■ In a wrongful death action, Md.Cts. & Jud.Proc. Code Ann. § 3–904(d) provides that:

For the death of a spouse, minor child, or parent of a minor child, the damages awarded under subsection (c) ["Damages to be divided among beneficiaries"] are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable.

Anne Balbos died about seventeen months after her husband's death. Paul Balbos, son of Leslie and Anne Balbos, testified that before his father died the couple took driving vacations together, going all the way to Colorado to visit Paul "many times." Paul also testified that his mother had a long history of arthritis and bursitis, and that she had heart palpitations and aneurisms. According to Paul, Leslie "basically took care of her" doing such things as washing the laundry, driving the car when they went out, and carrying the bags. Finally, Paul Balbos testified that his parents rode an "emotional merry-go-round" during Leslie's battle with cancer and that Leslie "would agonize over what [Anne] would do when he was gone."

At the close of plaintiffs' case, the defendants moved for judgment with respect to the wrongful death claim of Anne Balbos on grounds that there was insufficient evidence of damages to submit the claim to the jury. The court denied the motion. The defendants renewed the motion at the close of all the evidence and the court apparently denied it. The jury returned a verdict in favor of Anne Balbos's estate in the amount of $750,000. On appeal, Celotex assigns as error the court's failure to grant its motions for judgment. According to Celotex,

> While there is some evidence that the husband provided services to the wife during their joint lives, there is no evidence of the value of those services, nor is there any evidence of the effect of the husband's death upon the emotional circumstances of the surviving wife.

We note first that Anne Balbos's estate was not required to show that she suffered emotional pain in order to recover in her stead for the wrongful death of her husband. Damages for mental anguish and emotional pain and suffering are but a part of the list of injuries for which a wrongful death claimant may recover under § 3–904(d). Paul Balbos's testimony clearly shows that his mother, by virtue of her husband's death, suffered the loss of his society, companionship, comfort, protection, and marital care during the seventeen months that she survived him. Any one of these losses would have entitled her to recover under § 3–904(d). Thus, the estate produced sufficient evidence for the jury to find in the estate's favor.

As to Celotex's argument that "there is no evidence of the value of [Leslie Balbos's] services" to his wife, it is obvious that the Legislature never intended that wrongful death claimants be required to produce evidence of the monetary value of such services. The language of § 3–904(d) clearly distinguishes the sorts of losses suffered by Anne Balbos from "pecuniary losses." Because Ms. Balbos's losses were nonpecuniary, they were, by definition, impossible to prove by pecuniary standards.

We addressed a similar issue, the loss of consortium, in *Edmonds v. Murphy,* 83 Md.App. 133, 573 A.2d 853 (1990). In that case we quoted with approval from *Restatement (Second) of Torts* § 693 comment f, at 497 (1977), which provides in part:

The major element of damages in an action based on this Section ["Action by One Spouse for Harm Caused by Tort Against Other Spouse"] is any loss or impairment of the other spouse's society, companionship, affection and sexual relations. These are not matters of economic loss susceptible of pecuniary proof. . . .

*Edmonds,* 83 Md.App. at 167, 573 A.2d 853. We also noted in *Edmonds* that

[t]he cause of action for loss of consortium has been allowed for "loss of household and other services that are of such a character that they cannot be rendered by hired help and on which, by reason of their character, no market value can be placed". . . .

*Id.* at 168, 573 A.2d 853 (quoting 41 Am.Jur.2d *Husband and Wife* § 449, at 378 (1968)).

While damages for consortium-type losses generally pertain to those losses suffered by a spouse while the other, injured spouse is still alive, we believe that the equivalent losses (solatium) suffered by a spouse after the injured spouse dies—loss of society, companionship, comfort, protection, and marital care—also are not susceptible of pecuniary proof.

Celotex also appears to argue that Paul Balbos's testimony was insufficient because, for the most part, it dealt only with the period preceding Leslie Balbos's death. While that position would be quite significant to indicate the absence of "mental anguish [and] emotional pain and suffering" on the part of Anne Balbos after her husband's death, it has little effect, if any, on her other losses compensable under § 3–904(d). On the other hand, evidence of the Balboses' close and loving relationship before Leslie's death was obviously essential to prove her great loss. But for the companionship and society during their joint lives, there could have been no loss upon the death of either.

■ Finally, to the extent Celotex argues that the jury's award for damages to Anne Balbos was excessive, the award of damages in wrongful death cases generally is within the sound discretion of the jury. *Ory v. Libersky,* 40 Md.App. 151, 166, 389 A.2d 922, *cert. denied,* 283 Md. 737 (1978).

JUDGMENT FOR PUNITIVE DAMAGES IN FAVOR OF THE ESTATE OF SUTTON KNUCKLES REVERSED; ALL OTHER JUDGMENTS AFFIRMED; ONE–FIFTH OF THE COSTS TO BE PAID BY THE ESTATE OF SUTTON KNUCKLES; FOUR–FIFTHS OF THE COSTS TO BE PAID BY THE APPELLANTS.[35]

---

**35.** On September 5, 1990, Eagle–Picher Industries, Inc. moved the court to reconsider its opinion by "specifically setting forth that each of the Appellants have adopted the arguments of each Co–Appellant and that all issues decided in the Court's Opinion are deemed to have been decided in respect to all Appellants." Although the record is not quite clear as to whether all appellants adopted the arguments of each co-appellant, for the purposes of this opinion we shall deem that each appellant has adopted the argument of each co-appellant and that all issues decided are decided with respect to each appellant to which that issue might apply.